UNITED STATES of America, Plaintiff,

v.

FISH SMOKERS TRADE COUNCIL, INC.; Fish, Sea Food, Smoked Fish and Canning Workers Union of Greater New York, Local 635, American Federation of Labor; Vita Food Products, Incorporated; Banner Smoked Fish Corp.; Rosola Food Products, Inc.; American Smoked Fish Corp.; Nova Scotia Food Products Corp.; Ten Eyck Smoked Fish Corp.; Solomon Pruzan; Meyer Salzman; and Irving Masour, Defendants.

United States District Court
S. D. New York.
April 22, 1960.

---

Richard B. O'Donnell, Chief, N. Y. Office, John D. Swartz, Asst. Chief, N. Y. Office. Walter W. K. Bennett, Francis E. Dugan, Agnes T. Leen, Donald S. Engel, Samuel Greenbaum and Elliott Feldman, Dept. of Justice, New York City, for plaintiff.

Ashe & Rifkin, New York City, for defendants (George Rifkin, New York City, of counsel).

RYAN, Chief Judge.

This civil suit was filed under Section 4 of the Sherman Act to prevent and restrain continuing violations of Section 1 of the Act by defendants. 15 U.S.C.

Originally, there were eleven named defendants: Fish Smokers Trade Council, Inc.;[1] Fish, Sea Food, Smoked Fish and Canning Workers Union of Greater New York, Local 635, AFL; Vita Food Products, Incorporated; Banner Smoked Fish Corp.; Rosola Food Products, Inc.; American Smoked Fish Corp.; Nova Scotia Food Products Corp.; Ten Eyck Smoked Fish Corp.; Solomon Pruzan; Meyer Salzman and Irving Masour. All defendants except the Union and the individual defendants have consented to final judgment enjoining and restraining them from entering into any agreement in restraint of trade as specified in the complaint. There remain then as defendants only the Union and its three officers.

It is alleged that since 1952 the named defendants and co-conspirators, consisting of jobber members of the Union, officers and members of the Fish Smokers

---

1. A criminal indictment had been filed against these same defendants; after two trials in which the jury disagreed, and after denial by both trial Courts of a motion to acquit, the Government filed on April 18, 1958 a nolle prosequi. The prosecution of this civil suit, which had been filed on September 28, 1955, followed.

Council, along with persons unknown, have engaged and continue to be engaged in a combination and conspiracy to suppress and eliminate competition in the sale and distribution of smoked fish in restraint of commerce; that the conspiracy was carried out by a continuing agreement and concert of action whereby jobbers of smoked fish were to be induced and compelled to become members of the defendant Union and to refrain from competing with each other; the Union was to impose fines and penalize jobber members who sold to customers of fellow jobber members; the smokehouses were to boycott jobbers not members of the Union; and the Union was to circulate blacklists to the smokehouses, undertake strike action against smokehouses and picket or threaten to picket customers of non-member jobbers. Injunctive relief is sought directing the defendant Union to sever or expel from membership all jobbers engaged in the buying and selling of fish for their own account; and enjoining the defendant Union and the individual defendants in the future from organizing jobbers or entering into any agreement for the purpose of eliminating competition in the purchase and sale of smoked fish. The answer pleads that the commerce involved is minimal, that the jobbers are proper subjects of unionization because their work is similar to that of chauffeur employees, that there could have been no conspiracy between the Union and the smokehouses since the latter derived no benefit from the arrangement and were not willing participants, and that, in any event, the allegedly unlawful activities came to an end in 1954. The answer further challenges the jurisdiction of the Court, asserting that the activities complained of are matters exclusively within the province of the Na-

tional Labor Relations Board and that the Union did not authorize the acts of the individual defendants, as is required by Section 6 of the Norris-LaGuardia Act, to make it subjected to the relief sought.

There is one principal issue raised by the pleadings and that is whether the jobbers are independent business men as plaintiff maintains and therefore not a proper subject of unionization; if they are, then it follows that the defendants' alleged activities in forcing them into the Union and into agreements to allocate their customers is an act in restraint of trade within the stricture of the antitrust laws, Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L. Ed. 1939. If, however, these jobbers are a labor group as defendants contend, then their activities are protected by the Clayton and Norris-LaGuardia Acts and under Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63.[2]

The defendant, Fish, Sea Food, Smoked Fish & Canning Workers Union, is an affiliated local of the Amalgamated Meat Cutters & Butcher Workmen with a membership of about 700 employed in the live fish trade, in smokehouses and in the distribution of smoked fish as jobbers whose duties will be later more particularly described. It is organized under the laws of New York and has its principal place of business in the City of New York. Defendant Pruzan is its president; Salzman, its secretary-treasurer; and Masour, its business representative. The Fish Smokers Trade Council, Inc., was a membership corporation organized under the laws of the State of New York and composed of practically all the smokehouses in the metropolitan area; its function was to represent the smokehouses and negotiate on their be-

---

**2.** The Clayton Act, 15 U.S.C.A. § 17, provides: " * * * nothing contained in the antitrust laws shall be construed * * * to forbid or restrain individual members of such [labor] organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade * * *".

The Norris-LaGuardia Act, 29 U.S.C.A. § 101, provides: "No court of the United States * * *, shall have jurisdiction to issue any * * * injunction in a case involving or growing out of a labor dispute * * *".

half with the Union. The six smokehouse corporations were members of the Trade Council and five of them are New York corporations with their principal place of business in this city. The co-conspirators not named as defendants are the smoked fish jobber members of the Union and the officers and members of the Trade Council (the other smokehouses).[3]

By stipulation, the record of the second criminal trial, consisting of all the testimony and exhibits, was received in evidence on this trial and has been made the record of this trial.

No additional witnesses or exhibits were proffered by the parties; there were, however, two additional stipulations—one covered statistical information on the smoked fish industry; the other stipulation recited certain facts agreed upon by the parties and which are conceded. These stipulated facts are incorporated in the findings which I now make.

The commerce involved is the purchase and sale of smoked fish. From 1952 through 1955, there were about 15 smokehouses in the metropolitan area doing an annual total volume of sales of smoked fish in excess of 7 million dollars. The fish is caught in the waters off New England, Alaska, the Great Lakes, the West Coast and outside the territorial limits of the United States, and sold raw—fresh or frozen—or partly cured, to the smokehouses in New York and nearby New Jersey and shipped by truck and rail. The smokehouses process salmon, whitefish, chubs, eels, black cod, sturgeon, herring, trout, ciscoes, butterfish, carp, mackerel and spoonbill into kippered salmon, sturgeon, lox and shad. The process consists of putting the fish in a brine solution, smoking it and packing it for distribution. Most of the smokehouses sell the smoked fish to jobber wholesalers who, in turn, sell to their retail customers—"appetizing" shops and restaurants; only about six of them sell directly to retail customers of their own. These 15 smokehouses employ approximately 220 "production employees"—all members of defendant Union—wet workers, packers and chauffeurs; it is only with the last that we are concerned. Of the chauffeurs, 19 are paid a straight salary and 2 a salary plus commissions; 6 of these devote all their time to delivering fish to retail customers of the smokehouses by whom they are employed; 7 from 50% to 85%, 6 from 20% to 5%, and 1 only 1% of their time delivering to such retail customers; the balance of their time is spent in driving to pick up the raw fish purchased by the smokehouse from the public cold storage, bringing it to the smokehouse for processing and delivering it to shipping companies for shipments to the smokehouse's customers within and without the state. The chauffeurs are instructed on their routes by the smokehouses; they are told where to go, what merchandise to deliver, how much to charge and to whom to deliver. The chauffeurs do not sort or select the fish in the smokehouse for any particular customer; they do not make adjustment in price or weight; they have no authority to extend credit, although sometimes they do collect the bills from the customers for the smokehouses. All that these chauffeurs do is pick up the pre-selected fish which has been packaged for the particular customer and mark its weight on the delivery ticket, put it on the truck and upon arrival take it off the truck and bring it into the customer's establishment or shipping company office. They do not own their trucks; they do not pay the insurance on them or the cost of maintaining them; they are on a fixed salary regardless of the quality of their work or the quality of the fish or customer. The chauffeurs have the benefit of Social Security and income taxes are withheld for their tax accounts by the smokehouses, as are health and welfare benefits. They work a fixed weekly period. What merchandise a customer rejects, they return to the smokehouse at no loss to them, for the customer is not theirs but the smokehouse's which bears

3. Although the Council was dissolved by the Secretary of the State of New York in 1952, it has continued to carry on as a representative of the smokehouses.

the loss. In short, they are salaried employees—paid regularly for fixed hours of work.

The jobbers on the other hand—numbering about 75 in the metropolitan area —purchase the fish from any of the 15 smokehouses they choose—for cash or credit. The majority of them alone or with a helper, like the chauffeurs described, go into the smokehouse, pick up the box of fish and place it on the truck and take it off the truck to deliver it to their customer. Unlike the chauffeurs, however, they select and sort the fish for their particular customers; they select the customers they have solicited and determine what price they will charge and, consequently, what profit they stand to make. These jobbers make adjustments, extend credit to their customers and suffer the loss of non-payment or of fish not sold, since, except for defects, they may not return it to the smokehouses. The jobbers work their own hours and under their own conditions; their income depends upon their industry and fortitude and their contacts and salesmanship. They have no taxes withheld for them by the smokehouses. They own their trucks and pay the insurance and maintenance on them. With many of these jobbers, the smokehouse paints its name on the sides and back of the truck—the jobber's name being on the door of the truck. This is of no significance other than to advertise the smokehouse from which the jobber purchases all or some of his fish; it does not bind the jobber to the smokehouse in any respect, in fact, it is to the benefit of the smokehouse since advertising of the product of the smokehouse is had at small cost. The businessman character of the jobber is particularly evident in those larger jobbers who, like the smokehouses, have chauffeur employees do the physical work and these employees are members of the defendant Union. These men do the driving, the carrying and the lifting. This type of jobber in some instances is a corporation, which just handles the orders, courts the customers, fixes and sets prices and makes collections; indeed, some of them in addition also operate their own "appetizing" stores.

There was some sketchy evidence that about 30 years ago one of the largest smokehouses sold its trucks and routes to its chauffeurs and set them up as independent distributors instead of chauffeur employees. However, the greater part of the routes so sold were meat and "provision" routes and smoked fish was but a sideline; in the past 20 years only 2 chauffeurs have become jobbers. In any event, there is certainly no evidence here of any wholesale conversion of employees into "vendors" for the purpose of avoiding union wages and conditions, such as was found in Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, supra. While a jobber and a chauffeur employee perform identical physical work, one has sole discretion in the performance of this work while the other just follows his employer's orders.

Some of the wholesale jobbers and other customers to whom the smokehouses sell are located outside the state and, in turn, the customers to whom the jobbers sell are in states other than those in which the jobbers are located. Fresh and smoked fish is perishable—it must be kept moving. The transportation, purchase, receipt and processing of fresh fish into smoked fish by the smokehouses and its subsequent distribution and sale to jobbers and retailers constitutes a regular and continuous flow of smoked fish in interstate commerce from the fisherman to the ultimate consumer.

Prior to 1952, a few jobbers had joined the Union voluntarily for various reasons not here important. Their status and their working conditions do not appear to have been any different from those just described. Then, in October, 1952—the year of the conspiracy—about half of the smokehouses in the City of New York entered into an agreement appointing the Fish Smokers Trade Council, Inc., their collective bargaining agent for the purpose of negotiating and executing a contract on their behalf with the Union. On the same day the Council entered into a collective bargaining

agreement with the Union. This agreement, which was to run for two years, contains the conventional provisions for wages, hours, vacations, welfare payments and the like, and then under the paragraph headed "Recognition" the following clause, hereinafter referred to as Clause 7:

"In the event that an Employer uses any means for the distribution of its products other than through its own employees, such as agent-distributors, etc., then such agent-distributors, etc., must be members of the Union, subject to its rules and regulations."

There is no question but that by "agent-distributors" were meant the jobbers and that the clause meant exactly what it said—and was so understood by the parties to the contract; that only jobber members of the Union were to be sold fish by the smokehouses and non-members excluded from purchasing smoked fish. Another clause which had been inserted by the Union in the contract reading: "No existing routes operated by salesman-distributors shall be combined or consolidated with any other route operated by salesmen-distributors or agent distributors without the written consent of the Union" had, at the request of the Council, been deleted because it had not been negotiated by them and because the Council recognized the impossibility of performance since it had no control over the routes of "salesmen-distributors". Apparently neither clause had been negotiated; they were both the Union's idea but, after some hesitation, the Council assented to Clause 7. At this point there was clearly an agreement between the Union and the smokehouses to restrain trade by a concerted refusal to sell to jobbers who were not members of the Union. By 1953, the rest of the smokehouses—who had had separate one-year contracts with the Union with no such restrictions with respect to jobbers, and which contracts had now expired—by letter agreement agreed to have the Council represent them also and to be bound by the two-year contract and by the restraints it imposed on their business dealings.

In order to enforce Clause 7, the Union called a meeting of the jobbers at which it announced that, by virtue of its agreement with the Council, the smokehouses would refuse to sell to jobbers who were not members in good standing of the Union. The Union representatives promised that, once they were organized, the Union would see to it that their "stops" were protected—i. e., their customers allocated and not competed for by their fellow jobbers. This, thus, was the declared purpose of the Union in drawing the jobbers into its fold. The meeting was not attended by any of the smokehouse employees including the chauffeurs; it was addressed by the individual defendants who also waged a personal campaign against individual jobbers, exhorting them to join and pay their dues or run the risk of not being able to buy any more fish from the smokehouses. If successful, right then and there one or other of the defendants would accept the initiation fee and the current dues, and issue a receipt to the effect that the particular jobber was a member of the Union where the jobber was recalcitrant, he found that the threat of no sale was carried out and was informed by the smokehouse when he went to pick up his order that, at the direction of the Union, the smokehouse was forbidden from selling him any more fish until the jobber complied and joined. Upon joining the Union, the jobbers were to attend meetings regularly or be fined.

In order to secure the cooperation of the unenthusiastic smokehouses, essential to the success of the plan, the Union circulated regularly the names of jobbers who were resisting unionization or not paying their dues with directions to boycott them or run the risk of a strike in the smokehouse. In one instance at least where a smokehouse had taken over a jobber's "stop", the Union ordered the jobbers who purchased from the particular smokehouse to cease buying there and threatened to picket a re-

tailer customer of the offending smokehouse until it returned the customer to the jobber. Similar threats were used against retailers who purchased from non-union jobbers.

In spite of the constant vigilance of the Union, neither the smokehouse nor the jobber were satisfied with the arrangement—the first because they were limited in their sales to Union jobbers only; the second because the Union was not successfully protecting their stops; both groups were subverting the effectiveness of Clause 7—the smokehouses by selling subrosa to non-member jobbers, who, in turn, were competing for the member jobber's customers, while these were refusing to continue paying dues or attending meetings.

In the summer of 1953, the Union saw an opportunity to secure renewed compliance from the smokehouses. The smokehouses had requested a meeting with the Union in order to obtain a modification of the vacation clause of the 1952 contract (under which they were all bound at this time) to substitute staggered two-week vacations in place of the two-week complete shutdown of the industry provided for and which they had found proved an extreme hardship to them. The Union acceded to their request but only on condition that the smokehouses observe the letter and spirit of Clause 7 to which the Council agreed and to a certain extent did observe. The following summer the same request was made and granted on the same condition.

As the Fall of 1954 approached and with it the expiration of the 1952 contract, the Council refused to negotiate a new contract on behalf of the smokehouses unless the Union would agree to omit Clause 7 from the new contract. True, there were a few other minor areas of dispute between the parties, but these were the usual ones and the primary factor for the Council's adamant position

was the presence of Clause 7. As a direct result of its refusal and the Union's insistence, negotiations fell through and the old contract expired.

The Union called a strike against the smokehouses in November, 1954, which lasted two weeks. Agreement was finally reached and Clause 7 was not put in the new contract, although the smokehouses were reminded significantly by the Union to bear in mind that the jobbers still would be members of the Union. Also, immediately preceding the strike and on October 28, 1954, 9 jobbers who were willing to continue having their customers allocated, at the request of the Union signed a petition authorizing the Union to represent them in collective bargaining with the Council and to demand on their behalf: 1) 5% shrinkage—which meant a 5% discount to the jobbers in the wholesale price from the smokehouses in order to absorb the loss of weight in the fish and consequent loss of profit when resold by the jobbers to the retailers; 2) $3 to the Welfare Fund and $4 to the Pension Fund—as for the other production employees of the smokehouses; 3) no withdrawal of credit from any distributor (jobber) without notice to the Union and the right of the Union to demand arbitration on behalf of the distributor (jobber); and 4) no smokehouse to have the right to refuse to sell merchandise to any Union distributor (jobber) or to give a distributor inferior merchandise.

During this period, the unwilling jobbers had not been idle either. About forty of these resigned from the Union, and retained an attorney to represent them and to file suit in the state court to enjoin the defendants from forcing them to remain in the Union and from threatening to picket their customers, should they leave the Union.[4] Aside from their impatience at paying dues and receiving nothing in return, they were piqued at the fact that the Union had called the strike—seriously affecting

4. Two petitions were filed in the state court seeking this relief and both, it appears, were denied.

their business—without consulting them. In fact, during the strike several of them went into the smokehouses under cover of darkness and prepared and sorted their fish.

The upshot of this abortive rebellion was that the Union, aware of the jobbers' failure to enjoin its activities, refused to accept their resignations, and summoned them to a special meeting at which it was announced by the individual defendants that, upon payment of back dues, the jobbers would be reinstated in the Union and permitted to set up a special division composed of a grievance committee to take care of their particular problems—i. e., protection of stops and allocation of customers.

Although the Division was to be ostensibly autonomous in operation, its by-laws were drawn up by the Union and the meetings of its Executive Board, which was composed of jobbers, were presided over by one or other of the individual defendants who also rendered the decisions. The sole purpose of the Grievance Committee of the Division was the enforcement of the "no raiding agreement"—no raiding on one another's customers. It was agreed by the jobber members that they would not do anything inconsistent with the Constitution of the Union and that they would take no action without the advice of Union counsel—demonstrating quite effectively that the Division was but a branch of the Union acting under its aegis.

Enforcement of the "no raiding agreement" was carried out as follows: complaints in writing from its members that one of them was competing for another's customer were received by the Board; the offender would be summoned before the Committee and directed to return the customer and perhaps pay a fine or suffer expulsion from the Union —which, in effect, meant no fish from the smokehouse and, assuming the jobber had obtained fish, no sale to his retail customer who, for good measure, might also be threatened with a picket. These decisions were made by the Union and reported to all the members of the Division at their general meeting at which the Union defendants were also present. The activities of the Division and the Union evidenced that, although Clause 7 was no longer embodied in the 1954 collective bargaining agreement, it was very much alive in spirit and its objective of suppressing competition among the jobbers being diligently carried out through 1955, until the dissolution of the Division in the fall of that year.

But whether such agreement among the smokehouses, the Union and the jobbers was simply the usual closed shop labor agreement in order "to see that each of them (the Jobber) earns a living, and that not one guy gets it áll * * * and that everyone gets an even break", as defendant argues, and consequently lawful under the Milk Wagon Drivers' Union decision, or whether it was really a conspiracy masquerading as a labor agreement in order to restrain competition between business men as in Allen Bradley Co. v. Local Union No. 3, supra; United States v. Employing Lathers Ass'n, 347 U.S. 198, 74 S.Ct. 135, 98 L.Ed. 627, and United States v. Employing Plasterers' Ass'n, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618, depends on whether the jobbers, although so-called independent business men, were really a labor group.

If the work and functions they performed in the smoked fish industry conflicted with or competed with the work and functions performed by the chauffeur employees of the smokehouses, and affected the hours, working conditions and wages of these men, then, regardless of what they called themselves, the jobbers would lawfully be forced into the Union. However, it is evident that the mere fact that the jobbers worked long hours and at times earned less than the chauffeur employees had no effect on the working conditions or wages of the chauffeurs—other than the inevitable causal effect which demand or lack of demand of smoked fish by the jobbers

and their customers would have on its production by the smokehouses and the welfare of their employees. There was no competition in any respect between the chauffeurs and the jobbers—if any, it was between the smokehouses who sold retail and the jobbers. Although the physical aspect of the work of these two groups is similar, "the economic and social difference between them lies in the method of compensation and return for their toil." People v. Distributors Division, 169 Misc. 255, 7 N.Y.S.2d 185, 187.

The demands which were made by the Union of the smokehouses on behalf of the jobbers in 1954—excepting perhaps that concerning the welfare and pension funds—were purely the demands and requirements of an independent business man having to do with extension of credit, price and discrimination, and not with wages, working conditions or hours, of employees. This is particularly true of the fourth item—which in spite of its language was no more than an attempt to have the smokehouses continue to boycott those jobbers who were not respecting the agreement to allocate customers. The complaint against the smokehouses had not been that they were boycotting any particular jobbers, but that they had refused to boycott any jobbers—whether union or non-union members. That they were not bona fide members of the Union is further evidenced by the fact that, although the decision to strike was put to the Union membership and a tax assessed, the jobbers were not even consulted about it although they were dues-paying members gravely affected by it.

▮ We conclude that the agreement among the Union, the smokehouses and the jobbers was solely to restrain competition among the jobbers and not to settle any labor dispute; that the agreement was successful in that it did restrain the trade and commerce in the sale, purchase and distribution of smoked fish among the several states; that this was accomplished by allocating customers, by the "no raiding" agreement, by cutting off the supply of fish to jobbers and their customers and consequently the public, if the jobbers did not refrain from competing; by calling a strike of the entire industry because of the smokehouses' reluctance to continue with the boycott agreement.

The agreement was initiated by the Union and agreed to and carried out with the help of the smokehouses, without whose cooperation the conspiracy could never have gotten afoot. The smokehouses, although not wholeheartedly committed to the arrangement, were fully aware of the Union's activities and purpose in seeking their assistance in enforcing Clause 7. They agreed and did so in exchange for certain benefits to them wholly unconnected with the jobbers' lot. On the other side of the conspiracy, we find that although many of the jobbers did resist the Union's efforts, many of them did assist in enforcing the allocation of stops and employed the Union machinery and officers to enforce restraints which they could not otherwise lawfully enforce. The Union was the medium through which a purely business arrangement was sought to be immunized from the stricture of the antitrust laws.[5]

This was not the first time the jobbers had used the cloak of labor in this fashion. In 1938 the New York State Supreme Court found that they had taken on "the guise and nomenclature of a union in order to obtain an immunity to carry on its [their] activities as an illegal combination to restrain trade and create a monopoly" and were accordingly restrained. People v. Distributors Division, 7 N.Y.S.2d 186–187, supra. Again in 1941 they were found to have coerced membership in their "union" in order to protect their stops and to have picketed

---

5. Although the respective guilt of the smokehouses and the jobbers is not one of the issues to be determined in this trial, a conspiracy among them is charged and a finding of guilt on the part of the Union necessitates discussion of the role they played.

customers of non-union jobbers in restraint of trade. Fertel v. Rosenzweig, Sup., 28 N.Y.S.2d 6. It is clear that the jobbers were particularly familiar with the Union's plan when it drew up Clause 7 and formed the Jobbers' Division. Despite the omission of Clause 7 in the 1954 contract, the "essential agreement combination or conspiracy might be implied from a course of dealing" among the parties. United States v. Parke, Davis & Co., Inc., 1960, 362 U.S. 29, 80 S.Ct. 503, 509, 4 L.Ed.2d 505—quoting from Frey & Son, Inc. v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892.

■ The Clayton and Norris-LaGuardia Acts, raised as a shield by defendants for their otherwise unlawful activities, cannot avail them here. By their very language, these Acts are limited to the pursuit of legitimate objects of labor and labor disputes affecting the employer-employee relationship for the purpose of mutual help, which language encompasses neither disputes over the sales of commodities nor employer help in controlling market and price. Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750; Allen Bradley Co. v. Local Union No. 3, supra. Here the Union was not pursuing a legitimate objective of labor, but attempting to regulate a property function belonging exclusively to the jobbers and their customers. Jewel Tea Co. v. Local Unions, etc., 7 Cir., 274 F.2d 217, certiorari denied 1960, 80 S.Ct. 757, 4 L.Ed.2d 747.

The actions of the three individual defendants in what we have found were activities designed to suppress competition were carried on on behalf of the Union. These defendants were elected officers authorized to negotiate the collective bargaining agreement with the Council in 1952 and 1954; they reported regularly to the membership the organization of the jobbers and the progress in the enforcement of Clause 7. They announced the necessity of the strike which we have found flowed directly from Clause 7 and gave to the membership as the reason for its need the reluctance of the jobbers and the smokehouses to abide by its provisions. The membership, fully informed of what was going on by the regular reports of the individual defendants, read and ratified the minutes of the meeting. The Union participated, authorized and ratified the acts of its officers; it knowingly permitted its machinery and name to be used by a non-labor group and received the benefit of the dues collected; it became thereby a party to the conspiracy along with the jobbers and the smokehouses. United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973.

We conclude that this Court has jurisdiction over the subject matter and the defendants.

■ In view of defendants' tenacity in their contention that the jobbers are a group capable of being unionized and that only the Government suit prevented the Union from further regulating their activities, the jobbers' willingness to have competition among them suppressed after two injunctions restraining them from pursuing such activities had been entered by the State Court and the fact that Clause 7 was still being enforced for a year after it had been deleted from the agreement, it would be unrealistic of this Court to infer that the defendants will abandon their unlawful activities. It is incumbent on this Court to protect the public from a continuation of these activities by appropriate injunction. United States v. Parke, Davis & Co., supra.

Let an appropriate judgment enjoining and restraining these defendants be submitted on notice.