UNITED STATES of America,
Plaintiff–Appellee,

v.

COOPERATIVE THEATRES OF OHIO,
INC. and David Beaupain,
Defendants–Appellants.

No. 87–3594.

United States Court of Appeals,
Sixth Circuit.

March 8, 1988.

Robert J. Rotatori, argued, Susan L. Gragel, Gold, Rotatori, Schwartz & Gibbons, Cleveland, Ohio, for defendants-appellants.

Edmund Round, Anne L. Porter, Cheri B. Cunningham, U.S. Dept. of Justice, Antitrust Div., Cleveland, Ohio, John J. Powers, III, Marion L. Jetton, argued, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before MARTIN and GUY, Circuit Judges, and JOHNSTONE, District Judge.*

---

* Honorable Edward H. Johnstone, United States District Court, Western District of Kentucky, sitting by designation.

**1368**

PER CURIAM.

Defendants were found guilty after a jury trial of engaging in illegal trade practices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The defendants were charged with entering into a conspiracy in restraint of trade whereby each of the two competing corporations agreed to refrain from competing for customers who were currently being serviced by the other rival corporation. Under the terms of the alleged agreement, the companies remained free to compete for new customers. The district court ruled that the alleged conduct constituted a per se violation of section 1 of the Sherman Act, and the jury found that the defendants had entered into the alleged illegal conspiracy. On appeal, defendants argue that the district court should have applied the "rule of reason" standard instead of the *per se* rule. Defendants also contend that there is insufficient evidence to support the convictions. For the following reasons, the judgment below is affirmed.

I.

This case involves an alleged agreement not to compete between two movie theater booking agents, Co–Operative Theatres of Ohio, Inc. (Co–Op), and Tri–State Theatre Services, Inc. (Tri–State). According to the facts alleged in the indictment, the agreement provided that "Co–Op would not attempt to become the booking agent for any theater that was already serviced by Tri–State in Ohio and West Virginia" and vice versa. Both companies operated as "middlemen" negotiating on behalf of independent movie theater owners to select and lease motion pictures from various distributors. The distributors are headquartered in several major cities known as "film exchanges." Defendant Tri–State has a Cincinnati office and is located in the Cincinnati exchange. Defendant Co–Op is based in Cleveland and operates primarily in that area.

In 1981, Co–Op began to seek customers in southern Ohio. Soon thereafter, Tri–State began to advertise the availability of its services in the Cleveland exchange. Edward Handler, as the Vice President of Tri–State, testified under a grant of immunity on behalf of the government. Handler told the jury that he was approached at a trade convention by defendant David Beaupain, an officer of Co–Op, who allegedly told Handler, "Tell your boss to stop calling our accounts, cause if you don't, we have a lot of your accounts calling us and we will start taking your accounts." When informed of Beaupain's threat, Handler's boss, Philip Borack, replied that Beaupain was bluffing. Following the trade convention, Co–Op began to book additional accounts in the Cincinnati exchange, including some former Tri–State accounts.

In the fall of 1981, Handler telephoned Beaupain and told him that "we should try to get our bosses together and have a meeting to stop this calling on each other's accounts." In November, 1981, a luncheon meeting was held in Dayton, Ohio, and attended by Handler, Borack, Beaupain, and Beaupain's boss, Blair Mooney. On direct examination, Handler stated that he did not recall the specifics of the discussion at the luncheon. When asked about the "substance" of Mr. Borack's comments during the conversation, Handler replied that "Tri–State and Co–Op were wasting a lot of time and energy in calling each other's accounts and it would be beneficial to both companies to stop, to stop doing this." Handler also testified that Blair Mooney had said "basically, the same thing." Handler did not recall any comments which may have been made by himself or Beaupain.

On cross-examination, Handler admitted that Tri–State had relied primarily on referrals in order to obtain customers. According to Handler, Tri–State had engaged in a brief campaign during the summer of 1981 to obtain customers in northern Ohio by contacting theater owners by telephone. Handler admitted, however, that this practice of making unsolicited "cold calls" was discontinued prior to the November lunch meeting because the technique was ineffective. Handler then testified that the agreement would not have prevented Tri–State from accepting unsolicited business from

one of Co–Op's former accounts. When asked whether anyone at the lunch had used words like "agreement," "deal," "commitment," "assurance," or "promise," Handler replied that he did not recall. Handler again admitted that Tri–State had stopped cold calls for "independent business reasons" which "had nothing to do with anything at the Dayton luncheon." Finally, in response to a series of leading questions, Handler admitted that nothing was said or done at the luncheon meeting which was intended to restrict competition.

The government attempted to rehabilitate Handler's testimony on re-direct examination by asking Handler to tell the court "what you agreed to at the Dayton lunch." Handler replied that "Tri–State would not call on any Co–Operative Theatres' accounts." Handler's account of the luncheon meeting was disputed by defendants Mooney and Borack who testified that no agreement was made during the course of the lunch. Rather, they said that the purpose of the meeting was to defuse tensions and any personal animosity which may have resulted from increased competition between the two companies.

In addition to Handler, the government also called a theater owner, Solly Leo Yassenoff, who had formerly booked his films through Tri–State until October of 1981, when he switched to Co–Op. According to Yassenoff, Beaupain had called him and told him of a "war" between Co–Op and Tri–State, and Beaupain wanted to get Yassenoff's theaters into the Co–Op fold before a "truce" was declared. The government also called on three other theater owners who testified that Tri–State had called on them prior to November, 1981, but had subsequently refused their business on the grounds that Tri–State and Co–Op had an agreement not to take each other's customers. One of the theater owners further testified that he also contacted the President of Co–Op, Blair Mooney, who confirmed the existence of the agreement between Co–Op and Tri–State.

The defendants presented evidence to show that the two companies had continued to compete for new business throughout the area even after the November, 1981, lunch meeting. The defendants also emphasized that both companies had abandoned the "cold call" approach prior to November, 1981, and instead returned to their traditional method of gaining new accounts through referrals and general advertisements in trade magazines. Finally, there was evidence that Co–Op had accepted business which had come unsolicited from one of Tri–State's former accounts.

In rejecting defendants' pretrial motion for dismissal, the trial court found that the alleged agreement constituted a per se violation of section 1 of the Sherman Act because it was a horizontal agreement among competitors to allocate customers. Moreover, the court noted that the defendants had failed to articulate any potentially pro-competitive justification for the agreement. Accordingly, the jury was charged as follows:

> Certain types of agreements, combinations or conspiracies are unreasonable per se. This means that the mere formation of the agreement, combination or conspiracy itself constitutes an unreasonable restraint of commerce, and it is not necessary for the prosecution to prove the extent of the effect on trade or commerce.

> An agreement between two competitors to not attempt to become the booking agent for each other's customers is such a per se unreasonable restraint of trade.

The district court then went on to instruct the jury to determine whether the government had proved the existence of the charged conspiracy, whether the defendants had knowingly entered into the conspiracy, and whether the defendants did so with a knowledge of the probable anticompetitive effects of the agreement.

The jury returned guilty verdicts against the corporate defendants, Co–Op and Tri–State, and against the Vice President of Co–Op, David Beaupain. The President of Co–Op, Blair Mooney, and the President of Tri–State, Philip Borack, were acquitted. Co–Op and Tri–State were each fined $50,000. Beaupain was sentenced to two years

probation. Tri–State, Co–Op, and Beaupain filed motions for judgment of acquittal and new trial. Those motions were denied in a written opinion and order dated May 28, 1987. Only Co–Op and Beaupain have appealed their convictions.

## II.

Defendants present two issues on appeal. First, they claim that the alleged agreement should have been analyzed under the rule of reason rather than the *per se* standard applied by the district court. Second, defendants contend that the evidence presented by the government was insufficient to support their convictions. We address each of these issues *seriatim.*

Section 1 of the Sherman Act declares that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1. Despite the broad language of the statute, the courts have limited the prohibitions of the Sherman Act to those restraints on trade which are deemed "unreasonable."[1] In determining whether restraints of trade unreasonably restrict competition, courts have utilized two methods of analysis—the *per se* rule and the rule of reason. As stated by the Supreme Court in *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978):

> There are, thus, two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal *per se.*" In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the re-

straint, and the reasons why it was imposed.

*Id.* at 692, 98 S.Ct. at 1365.

■ There is a general presumption in favor of applying the rule of reason standard except in those cases where the alleged agreement or activity is "manifestly anticompetitive." *See Continental T.V. v. GTE Sylvania,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). *See also White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). In *Northern Pacific Railway v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), the Court gave a general description of the type of case in which application of the *per se* rule would be appropriate:

> However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

356 U.S. at 5, 78 S.Ct. at 518.

As previously noted, the district court found that the alleged agreement between the defendants in this case was a scheme to allocate customers which is one of the types of "horizontal" restraints that are deemed unreasonably restrictive *per se. See United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078 (5th Cir.), *cert.*

---

**1.** If section 1 were read literally, it would outlaw virtually every type of trade agreement since the inherent effect of contracts is to place certain restraints on the contracting parties. *See United States v. Topco Associates, Inc.,* 405

U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) (citing *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)).

*denied,* 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978).

On appeal, defendants contend that the district court erred by applying the *per se* standard to the alleged agreement in this case. Defendants were charged with having entered into an agreement whereby each "would not attempt to become the booking agent for any theatre that was already served by [the other]." According to defendants, the language which appears in the indictment indicates that the allegedly illegal agreement was limited in scope and that it only prevented the respective parties from *actively* soliciting each other's customers. Under defendants' interpretation of the agreement as alleged in the indictment, the defendants would have remained free to accept *unsolicited* business from the competitor's customers. Thus, the defendants characterize the agreement as a "no-solicitation" agreement. The defendants further argue that this type of alleged restraint on trade has never been challenged in the federal courts before and, therefore, the *per se* rule should not be applied.

In support of their position, defendants quote excerpts from several leading Supreme Court cases. For instance, in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), the Court stated, "It is only after considerable experience with certain relationships that courts classify them as *per se* violations of the Sherman Act." Defendants, however, fail to mention that in the very next line of that opinion, the Supreme Court goes on to state:

One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, *e.g.,* manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that "[h]orizontal territorial limitations ...

are naked restraints of trade with no purpose except stifling of competition." 405 U.S. at 608, 92 S.Ct. at 1133–34 (citations omitted). Thus, in *Topco,* the Supreme Court held that Topco's scheme of allocating territories to minimize competition at the retail level is a horizontal restraint constituting a *per se* violation of section 1 of the Sherman Act and that the district court had erred in applying the rule of reason in that case. We find that, when read in its entirety, the Supreme Court's opinion in *Topco* undermines rather than bolsters defendants' position.

Defendants attempt to distinguish *Topco,* the cases cited therein, and the other cases cited by the government on appeal which stand for the proposition that a horizontal agreement to allocate customers between competing companies is a *per se* violation of section 1 of the Sherman Act. *See Topco,* 405 U.S. at 608, 92 S.Ct. at 1133–34; *see also United States v. Koppers Co.,* 652 F.2d 290 (2d Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed. 2d 617 (1981); *United States v. Brighton Building and Maintenance Co.,* 598 F.2d 1101 (7th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *United States v. Flom,* 558 F.2d 1179 (5th Cir. 1977); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563 (2d Cir. 1961); *United States v. Rubbish Removal,* 602 F.Supp. 595 (N.D.N.Y.1984); *United States v. Fish Smokers Trade Council,* 183 F.Supp. 227 (S.D.N.Y.1960); *United States v. American Linen Supply Co.,* 141 F.Supp. 105 (N.D.Ill.1956); *Johnson v. Joseph Schlitz Brewing Co.,* 33 F.Supp. 176 (E.D.Tenn.1940), *aff'd per curiam,* 123 F.2d 1016 (6th Cir.1941).

Defendants argue that in each of these cases the restrictions imposed were more extensive than the ones alleged in the case at bar. Many of these cases involved explicit price fixing agreements or allocation of specific customers according to geographic location or enforcement of agreements through coercion. By emphasizing the limited nature of the alleged agreement, defendants argue that an adverse affect on competition with the relevant

market should not be presumed by the court through the application of the *per se* rule. Defendants also stress that the terms of the "no-solicitation" agreement was consistent with the industry-wide practice of relying on referrals to obtain new business. Thus, defendants conclude that the agreement was unlikely to have a significant impact on the level of competition. In further support of this argument, the defendants rely on the Supreme Court's opinion in *Continental T.V. v. GTE Sylvania,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In *Continental,* the Court overturned its previous ruling in *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). In *Schwinn,* the Court had held that certain types of "vertical restraints" imposed by a manufacturer on the distributors and retailers were *per se* violations of the Sherman Act. Specifically, the Court held that Schwinn's policy of limiting competition among its franchisees by placing territorial restrictions on the outlets was a *per se* violation in cases where title to the Schwinn bicycles had actually passed from the manufacturer to the distributor or retailer. But the *Schwinn* Court also held that similar vertical restrictions should be analyzed under the rule of reason in cases where the manufacturer retains title to the product until it is sold to the ultimate consumer.

In *Continental,* the Court was again confronted with vertical restrictions placed by the manufacturer on the distribution and sale of its products. The Supreme Court rejected the reasoning of the appellate court which had attempted to distinguish the *Schwinn* case. Instead, the Supreme Court chose to expressly overrule its previous decision in *Schwinn.* Justice Powell, writing for the majority in *Continental,* found that there was no principled basis for the distinction drawn in *Schwinn* between sale and non-sale transactions. The question of whether title to the goods had formally passed was totally interrelated to the underlying policy concerns which should be considered when determining whether a particular type of restriction violates section 1 of the Sherman Act. The

majority opinion then went on to note that while vertical restrictions on brand name products would tend to inhibit intra-brand competition, they could also promote inter-brand competition. Therefore, the Court overturned the application of the *per se* standard to vertical restrictions and held that such practices should be analyzed under the rule of reason to determine whether the pro-competitive effects outweighed the anti-competitive effects. In so holding, the Court stated that "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing." *Continental,* 433 U.S. at 59, 97 S.Ct. at 2562.

The defendants rely heavily on the language quoted above to support their contention that the *per se* rule should not be applied to the agreement alleged in this case because the government has failed to prove that the agreement had any adverse impact on competition within the relevant market. We find the defendants' reliance on *Continental* misplaced. In *Continental,* the Court found that application of the *per se* rule of illegality to the vertical restraints challenged in that case was inappropriate because of the numerous pro-competitive aspects of the restraints. In contrast, the instant case involves a horizontal agreement between two competitors to refrain from seeking business from each other's existing accounts. This is plainly a form of customer allocation and, hence, is the type of "naked restraint" which triggers application of the *per se* rule of illegality. As noted by the district court, the defendants failed to articulate a single pro-competitive justification for the horizontal restrictions imposed by the alleged agreement.

For the same reason, we are not persuaded by the defendants' attempt to find support in the Supreme Court's opinion in *Broadcast Music v. CBS,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). In *Broadcast Music,* the Court overturned a ruling by the Second Circuit which had held that a "blanket licensing scheme" whereby licensees were allowed to perform certain copy-

righted material for a set fee constituted "price fixing" and thus a violation of the Sherman Act. Instead, the Court found that the case should be analyzed under the rule of reason and, therefore, reversed and remanded the case for further proceedings. 441 U.S. at 24–25, 99 S.Ct. at 1564–65. Once again, as in *Continental*, the basis for the *Broadcast* Court's decision to apply the rule of reason and not the *per se* standard was that the defendants had alleged several pro-competitive aspects of the restraints. In so concluding, the Court stated: "The blanket license, as we see it, is not a 'naked restrain[t] of trade with no purpose except stifling of competition,' but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use." 441 U.S. at 20, 99 S.Ct. at 1562 (citations omitted) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963)).

In sum, we find that the so-called "no-solicitation" agreement alleged in this case is undeniably a type of customer allocation scheme which courts have often condemned in the past as a *per se* violation of the Sherman Act. Furthermore, we find it unnecessary to engage in the "incredibly complicated and prolonged economic investigation" under the rule of reason standard where, as here, the alleged agreement is a "naked restraint" with no possible pro-competitive justification. Therefore, we hold that the district court correctly concluded that the agreement between the defendants not to call on each other's customers was an unreasonable restraint of trade as a matter of law.

### III.

Having concluded that the *per se* standard was properly applied, we now consider whether the evidence presented at trial was sufficient to support defendants' convictions.

On appeal from a criminal conviction, the standard of review is whether the relevant evidence could be accepted by a reasonably minded jury as adequate and sufficient to support the conclusion of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). The evidence is to be viewed in the light most favorable to the government. Moreover, every reasonable inference from the evidence must be drawn in the government's favor.

■ Where the court has concluded that the alleged activity amounts to a *per se* violation of section 1 of the Sherman Act, the government need only prove (1) the existence of the alleged agreement and (2) that defendants knowingly entered into the conspiracy. Contrary to the defendants' contentions, the government is not required in a *per se* case to show that the conspirators entered into the agreement with knowledge of its probable anti-competitive effects. *See United States v. W.F. Brinkley & Sons Construction Co.*, 783 F.2d 1157, 1161–62 (4th Cir.1986) (and cases cited therein). In cases involving an alleged *per se* violation, intent to restrain trade is presumed. *See United States v. Gillen*, 599 F.2d 541 (3rd Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). As noted by the Second Circuit, "a requirement that intent to go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the *per se* rule is designed to avoid." *United States v. Koppers*, 652 F.2d 290, 296 n. 6 (2nd Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981).

■ In the instant case, we find that the direct evidence presented through Handler's testimony when viewed in favor of the government was sufficient to allow a reasonable juror to conclude that defendants had entered into an illegal agreement not to seek business from each other's accounts. The government presented additional evidence through the testimony of several Co–Op customers who stated that Tri–State had refused to accept their business because of the agreement between the two firms.

Having considered the entire record, we find sufficient evidence to support the defendants' convictions.

AFFIRMED.