Joseph **CARROLL**, Charles Peterson, and Charles Turecamo, as Treasurer, Orchestra Leaders of Greater New York, Plaintiffs,

v.

**AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA**, Herman D. Kenin, as President of said Federation, Stanley Ballard, as Secretary of said Federation, and George V. Clancy, as Treasurer of said Federation, Associated Musicians of Greater New York Local 802, and Al Manuti, as President of Local 802, Max L. Arons, as Secretary of Local 802, and Hy Jaffe, as Treasurer of Local 802, Defendants.

United States District Court
S. D. New York.

May 17, 1965.

See also D.C., 35 F.R.D. 535.

Godfrey P. Schmidt, New York City, for plaintiffs.

McGoldrick, Dannett, Horowitz & Golub, New York City, for defendant American Federation of Musicians of United States and Canada; Emanuel Dannett, Eugene Mittelman, Herbert D. Schwartzman, New York City, of counsel.

Ashe & Rifkin, New York City, for defendant Associated Musicians of Greater New York Local 802; David I. Ashe, New York City, of counsel.

LEVET, District Judge.

The plaintiff-orchestra leaders claim that the defendants American Federation of Musicians of the United States and Canada ("Federation" or "AFM") and Associated Musicians of Greater New York Local 802 ("Local 802") have violated the antitrust laws. I have endeavored to categorize the multitude of alleged violations, making a sufficient number of Findings of Fact in each category to adequately define them. I have not found it either necessary or desirable to include every union regulation which might possibly be included in each category. The dispute in this case centers primarily on the applicable law and the interpretation to be given to the facts, rather than the facts themselves.

The court directed a consolidated trial in 60 Civil 2939 and 60 Civil 4926. The single set of Findings of Fact and Conclusions of Law relates to both actions.

Since the class suit was not sustained, this opinion relates exclusively to the plaintiffs in the action. Nevertheless, the court has found evidence presented as to other orchestra leaders who in certain respects are similarly situated to the plaintiffs relevant in making findings relating to some of plaintiffs' practices.

The parties stipulated that the testimony in 60 Civil 1169 and 60 Civil 4025 is part of the record in this case (1019–20). Consideration of damages was reserved for a time subsequent to the decision on liability.

This case having been tried, the court, after considering the pleadings, evidence, exhibits, briefs and stipulations of the parties and the proposed findings of fact and conclusions of law, makes the Findings of Fact and Conclusions of Law listed below.[1]

### FINDINGS OF FACT

#### I. THE PARTIES

*A. Plaintiffs*

1. Plaintiffs Joseph Carroll, Charles Peterson, Ben Cutler and Marty Levitt, at all times relevant herein, were and are orchestra leaders, and at the commencement of these actions were members of defendants AFM and Local 802. Neither Carroll nor Peterson is presently a member of defendant unions (Stipulated Fact 1).

2. Plaintiffs Charles Turecamo and Dan Terry have withdrawn from the action.

3. At all times relevant herein, plaintiff Peterson was an employee of corporations known as Charles Peterson Theatrical Productions, Inc. ("Peterson, Inc.") and Carlton M. Hub, Inc. ("Hub, Inc."). Peterson was the sole stockholder of Peterson, Inc. and now controls

1. References to "Stipulated Fact" are to those stipulated facts set forth in paragraph 3 of the pre-trial order herein. References to a number, "Ex." followed by a number, and "Ex." followed by a letter, are to the stenographer's minutes, plaintiffs' exhibits and defendants' exhibits, respectively. References to "St. Min." followed by a number are to pages in the stenographer's minutes of the trial of 60 Civil 1169 and 4025, which, pursuant to stipulation is part of the record in this action. "F.F." indicates Findings of Fact.

Hub, Inc. (1755, 1983–84). Peterson always handled his musical engagements through Peterson, Inc. until recently when he began to use Hub, Inc. too (1756, 1983, 1986, Exs. GB, GG, GD).

4. Plaintiff Peterson was expelled from the defendant unions for various reasons, including his failure to abide by the union minimum wage scale (2117–18; Exs. FR–FY).

5. Plaintiff Carroll was expelled from Federation for failing to furnish Local 38 of the Federation with information pertaining to an engagement which he performed in Westchester County. He was also expelled by Local 802 for violation of various of its By-Laws, including his failure to abide by Local 802's wage scales (Carroll v. Associated Musicians of Greater New York, Local 802, 235 F.Supp. 161 [S.D.N.Y.1963]).

6. There is no evidence that plaintiff Orchestra Leaders of Greater New York ("OLGNY") has in any way been damaged or aggrieved by any conduct of defendants or that it has any interest in these actions (see Stipulation of plaintiffs' counsel in letter to this court dated November 13, 1964).

7. Plaintiff Levitt performs services on club dates (577) and on steady engagements in hotels and ballrooms (564, 571).

8. Substantially all of plaintiff Cutler's services are performed in the club date field. (2227) He has also made one or two recordings and appeared on one television program (2560; St.Min. 83–84; Exs. 310, DR). In the steady engagement field he has performed in hotels, restaurants and nightclubs (2227; St.Min. 70–71).

9. Plaintiff Peterson is primarily engaged in the club date single engagement field. He has also worked in concerts and in the steady engagement field in certain hotels and dance halls between 1945 and 1950 (1742–43; St.Min. 854–858).

10. Plaintiff Carroll is "almost exclusively" engaged in the club date single engagement field. He served as a leader in the steady engagement field at the Stork Club between 1945–48 (1425).

11. The plaintiffs in practicing their professions:

(a) maintain their own offices where they employ steady and/or part-time employees (567; St.Min. 71, 76–81, 258–59, 347, 360);

(b) acquire business as a result of their own contacts, reputations, and personal solicitations (567; St.Min. 78–79, 261–62, 360);

(c) engage in and pay for advertising (567; St.Min. 80–85, 87, 127–128, 261–262, 360) and prominently display their names wherever their engagements are played, thus indicating that the orchestra is, e. g., the Charles Peterson Orchestra (St.Min. 116, 260, 347).

12. Because of Carroll's and Peterson's expulsions from the union, they were thereafter precluded from actively taking part in their engagements either as conductors or instrumentalists (1777–79, 1936–37, 2039–44, 2110–12). (See F.F. XV.)

*B. The Defendants*

13. Defendant Local 802 is a labor union affiliated with the defendant Federation and with the AFL-CIO. The territorial jurisdiction of defendant Local 802 consists of the five boroughs of New York City and Nassau and Suffolk Counties (Ex. CJ, Section 6, p. 5; St. Min. 80–81, 453).

14. Local 802 has over 30,000 members. They perform musical services as conductors, instrumentalists, arrangers and copyists. Local 802 represents, and has traditionally represented, among others, members who are orchestra leaders, subleaders and sidemen, and has collective bargaining agreements with various employers (Stipulated Fact 2).

15. Membership in a local affiliated with Federation implies membership in the Federation (Stipulated Fact 4).

16. Defendant Federation is a labor union affiliated with the AFL-CIO and it consists of 683 local unions (including defendant Local 802) located throughout

the United States and Canada (Stipulated Fact 5).

17. Defendant Federation has over 260,000 members, who perform musical services as conductors, instrumentalists, arrangers and copyists. The Federation represents, and has traditionally represented, among others, members who are orchestra leaders, subleaders and sidemen, and has collective bargaining agreements with various employers (Stipulated Fact 6).

18. Almost all orchestra leaders and sidemen in the United States are members of AFM or one of its locals (84, 164–65, 1105).

19. The AFM publishes and is governed by its "Constitution, By-Laws and Policy" (Exs. 300, 12, 160, 161, 162, 163, 164, 164a, 164b). Likewise, Local 802 publishes and is governed by its Constitution and By-Laws (Exs. 165–172, 141, 29) and other booklets including Price Lists and Wage Scale Booklets (Exs. 173–195, 205–209, 306).

20. Defendants Al Manuti, Max L. Arons and Hyman B. Jaffe are President, Secretary and Treasurer, respectively, of defendant Local 802 (Stipulated Fact 3).

21. Defendants Herman D. Kenin, Stanley Ballard and George V. Clancy are President, Secretary and Treasurer, respectively, of the defendant Federation (Stipulated Fact 7).

22. There is no evidence that any of the defendants who are officers of the defendant unions have committed, as individuals, any of the acts complained of by plaintiffs.

23. The defendants Al Manuti, Max L. Arons and Hyman B. Jaffe, together with other members of Local 802, are members of Local 802's Executive Board (the "Executive Board") (Ex. CJ, Section 4, p. 5).

## II. DEFINITIONS

24. "Single engagements" are engagements generally for one day, but always for less than one week (Stipulated Fact 8). All other engagements are referred to as "steady engagements" (id.).

25. For convenience of reference in this opinion, certain types of engagements sharing some common characteristics will be referred to as groups. Thus, a "club date" is a single engagement such as a wedding, commencement, bar mitzvah, debutante party, fashion show, or other social event (Stipulated Fact 8; St.Min. 69, 242–43, 438, 457–59, 806). Steady engagements at hotels, nightclubs, dance halls or restaurants will be called "hotel" steady engagements. Single engagements other than club date single engagements (3108, 3183–84, 3830–31, 3841), e. g., TV, recording, and all steady engagements, will be referred to as the "non-club date" field.

## III. MUSIC INDUSTRY GENERALLY

26. Members of defendant unions perform services as orchestra leaders, subleaders and sidemen on club dates and for hotels, restaurants, nightclubs, recording companies, broadcasting companies, theatres, steamships, and for The Radio City Music Hall, The Metropolitan Opera, The New York Philharmonic Society, and The City Center of New York (see F.F. I(A), supra, III, XIV, infra).

27. Plaintiffs and intervenors are in a market for musical services which includes states other than New York, as well as New York (1425, 2227, 2231).

28. Musical employment is highly casual, and except for employment by symphonic orchestras, a few opera societies and on staffs of network owned radio and television broadcasters, job tenure and enduring employer-employee relationships rarely exist (3673).

29. Musicians do not confine their activities to any one musical field. They seek engagements and perform services in any musical field where job opportunities exist (3291–96, 2156, 2159–65, 2417–18, 2875, 2889–90, 1159, 1160, Ex. CR). Thus, musicians who perform services as orchestra leaders, subleaders and sidemen in the club date field also perform services in non-club date fields (1160, 1314–15, 2417–18, 3074–75, 3291–96, 3661–62). Conversely, musicians who perform in the non-club date fields also work as leaders, subleaders, or sidemen

in the club date field when they are not otherwise engaged (564, 571, 1818, 1820, 1860, 1927–29, 2154–57, 2159–65, 2227–28, 2290–91, 2417–18, 2430, 2889–90, 3074–75, 3291–96, 3661–62).

30. The number of steady engagements is a small minority of the total number of engagements, single and steady (274–75, 350–51, 3108–09).

IV. LEADERS GENERALLY

31. Orchestra leaders, including plaintiffs, conduct at engagements at which they personally appear (839–41, 960, 1311, 1427; St.Min. 116, 393).

32. Conducting is a musical service and orchestra leaders, when conducting, fulfill the same function, whether they are "employers" (for any purpose) or "employees" (Stipulated Fact 11), and whether they are working in the single engagement or the steady engagement field. (578–79, 713–16, 1054–56, 1182–83, 3535–36).

33. Only a relatively small group of musicians act as leaders all or virtually all the time. Plaintiffs are included in this group (3666–67; Ex. 58).

V. JOB OR WAGE COMPETITION OR OTHER ECONOMIC INTER-RELATIONSHIP BETWEEN LEADERS AND OTHER UNION MEMBERS

A. *Interrelationship between leaders and sidemen who occasionally lead*

34. A considerable number of musicians act only occasionally as leaders and act as sidemen the rest of the time (Exs. K, L, M; Stipulated Fact 10).

35. Such musicians who work as sidemen in club date or non-club date fields perform as leaders in the hotel steady and club date fields. They bid for the same jobs as full-time leaders such as plaintiffs and perform the same musical service when they get a job. They also perform in the same places as full-time leaders (2291, 2553–54, 2571, 2395–96, 2411–12, 2422–23, 2427, 2428–30, 2874–75 2889–90, 2894, 3038–40, 3052–54, 3088–89, 3293, 3653–54, 3666–68, Exs. 58, DE, pp. 188–89, HE; F.F. 29).

B. *Interrelationship between leaders and subleaders*

36. Plaintiffs belong to a group of orchestra leaders operating primarily in the club date field and occasionally in the hotel steady field who regularly use subleaders for their engagements. They generally do this when they accept simultaneous engagements for more than one orchestra. Subject to instructions which are sometimes given by the leader, the subleader performs all the musical services which the leader would have performed had he been present (327, 565–66, 573, 582, 607, 616–17, 812, 826–27, 708, 838, 965, 1010–11, 1193–94, 1864–66, 1896, 2604–06, 3045; St.Min. 73, 76, 130–31, 176, 276, 307, 314, 393, 801, 873–74).

37. Subleaders are employees (conceded by plaintiffs in marking defendants' proposed findings of fact).

38. Each time plaintiffs personally conduct an orchestra in the hotel steady and club date fields they displace the services of a subleader who would otherwise have been engaged to conduct the orchestra (583–84, 565–66, 573, 582, 617, 704, 845, 812–14, 960–65, 1194, 1313, 1353, 1375–76, 1778–79, 2039–44, 2604–06; St.Min. 83–84; F.F. 36).

C. *Interrelationship between leaders and sidemen*

39. Instrumentalists who perform services in orchestras other than as leaders or subleaders are referred to as sidemen.

40. Sidemen are employees (conceded by plaintiffs in marking defendants' proposed findings of fact).

41. Almost without exception all members of defendant unions who are now orchestra leaders (including the individual plaintiffs herein) worked as sidemen when they joined defendant unions and continued to work as sidemen for a number of years thereafter (Stipulated Fact 13).

42. All members of Local 802 are entitled to have their names included in the directory of membership of Local 802 under whatever category they select. Each of the individual plaintiffs, while a

member of the union, was included in the directory as an instrumentalist. For example, Cutler is listed under the heading "saxophone," and Carroll was listed under the heading "drums" (Stipulated Fact 9).

43. Plaintiffs other than Peterson (2039) belong to a group of orchestra leaders, operating primarily in the club date field and occasionally in the hotel steady field, who often, but not always, play musical instruments in addition to conducting at engagements at which they personally appear (524, 609–10, 826, 839–40, 957–58, 961–62, 1194, 1311–12, 1352, 1375, 1427, 2370; Ex. DE p. 37; St. Min. 117).

44. An orchestra leader in playing an instrument, fills a requirement for an instrument in the orchestra just as any sideman does (194–95, 842, 1313–14, 1353, 1375–76, 3054–55).

45. Each time plaintiffs play instruments in the hotel steady or club date field they displace the services of a sideman who otherwise would have been engaged to play the same instrument that the particular plaintiff played (F.F. 43, 44; 609–10, 842, 958–62, 1194–95, 1313–14, 1353, 1375–76, 1778–79, 3657).

## VI. EMPLOYMENT RELATION IN TELEVISION AND RADIO

46. For many years Federation has entered into collective agreements with the three major television and radio broadcasting networks, viz., Columbia Broadcasting System, Inc., American Broadcasting-Paramount Theatres, Inc., and National Broadcasting Company, Inc. In addition, Local 802 enters into collective bargaining agreements with stations owned by the networks and with various other independently-owned stations, including WPIX (Exs. BL 1–4, BM, BN, BT, IO, IP, KJ, KM).

47. The network agreements result from joint negotiations with the three networks and similar individual collective bargaining agreements are entered into with each of the three networks (2258–66).

48. The network collective agreements relate primarily to two areas of broadcasting, viz.:

(a) live and video tape broadcasting (Exs. BL 1–4) under an agreement dated May 18, 1964 for a term commencing March 1, 1964 and ending June 30, 1966; and

(b) the recording of musical services on television film (Ex. IO) pursuant to an agreement dated May 1, 1964 for a term commencing May 1, 1964 and ending April 30, 1969 (2258–59).

49. The cost of furnishing music is a considerable expense to the networks and other broadcasting stations (2258, 2302).

50. Pursuant to collective agreements, each of the network broadcasting companies engages approximately 100 musicians, including orchestra leaders, who perform services on a regular annual basis (2262–63, 2268–69, 2305–06; Ex. BL 1–4). The musicians so engaged are generally referred to as "staff musicians" (2264, 2268–69). The networks, in addition, also employ musicians on a single engagement basis (2264, 2292–93, Ex. BL 1–4).

51. With regard to the services of musicians, whether employed either on a staff or a single engagement basis, each network broadcasting company, through the director of music operations or producer of a show:

(a) hires the orchestra leader (2256–57, 2270, 2271, 2317);

(b) hires each of the sidemen (2256–57, 2271, 2272–73);

(c) decides, subject to union minimum requirements, on the number of leaders and sidemen who are to be engaged (2272–73);

(d) determines, subject to contractual obligation, the compensation of musicians (2326);

(e) selects the sidemen who will play for the orchestra leader (2272). (The musicians performing services for the broadcasting company play under the leadership of different orchestra leaders,

some of whom are staff conductors and others, guest conductors (2269, 2277–78));

(f) determines the compositions to be played (2273–74);

(g) exercises control over the musical direction and decides how the orchestras are to render their pieces, including such things as tempo and variations in an arrangement (2275–76, 2280, 2311–12, 2319–20); sometimes the orchestra leader will provide guidance to the TV executive responsible for the program (2321);

(h) calls for rehearsals (2274);

(i) disciplines and discharges musicians who are unsatisfactory (2288–89, 2323; Ex. IP, pp. 13, 26);

(j) pays all expenses connected with the performances of the orchestras, including the cost of arrangements, the orchestra leader's salary, the sideman's salary, doubling, cartage fees, wardrobe allowance, extra compensation where makeup or costumes are required, transportation, insurance of instruments (2272–73, 2281–84, 2317; Exs. BL 1, 3, par. 5; BL 4, p. 9; IP, pp. 18, 20, 21; IO);

(k) furnishes paid vacations, meal periods and rest periods (2281–82);

(l) makes payments on behalf of the musicians to a pension welfare fund (Ex. BL 1, 3, par. 9; 2281);

(m) pays severance pay to laid-off musicians (2265).

52. The person vested with control over live and video tape broadcasts is the producer of the particular program involved. The producer of programs owned by the networks is an employee of the broadcasting company (2313–14).

53. Music for television films generally consists of background music which is inserted after the performance has already taken place and been captured on film. The persons responsible for the music on television film are the musical director and producer, both of whom are employed by the network broadcasting company (2284–86, 2319–20). The musical director, working in conjunction with the producer of a particular program, customarily does the following things with regard to the services of musicians:

(a) determines the type of music to be used in the film (2284–85, 2320);

(b) determines the persons who are to compose and arrange the music (2284, 2320);

(c) determines the orchestra leader to be used (2257, 2320);

(d) determines the sidemen to be used (2257, 2320);

(e) determines when the music is to be recorded on the tape which will be integrated with the film (2285–86); and

(f) supervises the integration of the music with the film so that the music sound tract is coordinated with the filmed action (2286–88).

54. The broadcasting companies withhold and pay over to the appropriate governmental agencies the usual employer deductions for all musicians, including orchestra leaders (2271). On rare occasions (less than six times a year for CBS), a broadcasting company engages the services of a name band and a lump sum is paid to the orchestra leader in payment for his services and the services of the sidemen performing with him (2297, 2299–2300, 2323).

55. The minimum union wages and working conditions relating to single engagements for networks are set forth in the collective agreements between the networks and defendant unions and are summarized in the booklet published by Local 802 entitled, "Price List Governing Single Engagements Radio and Television" (Ex. GJ; 2327).

56. The broadcasting companies have effective control over the rendition of services by musicians engaged by the broadcasting companies (2276–77, 2284–85, 2288, 2313–14, 2317, 2321).

57. Plaintiff Cutler performed services as a leader for a telecast by Station WPIX, New York (Ex. DR–3). Plaintiff Cutler was paid by separate check and all employer deductions were made by Station WPIX (id.). There is no evi-

dence that the degree of control exercised by the broadcasting company over the services of the musicians on Cutler's engagement differed from the control exercised by the broadcasting companies over musicians as set forth above.

## VII. EMPLOYMENT RELATIONSHIP IN RECORDING

58. Federation has entered into collective agreements with manufacturers of home phonograph records ("recording companies"). An agreement with recording companies expired December 31, 1963, and at that time an understanding had been reached between Federation and the recording companies with respect to the terms of a new collective agreement, which has not yet been reduced to writing (134–35).

59. The collective agreement between Federation and recording companies covers upwards of 1,000 recording companies and includes every major manufacturer of records in the United States and Canada (Ex. FG–1).

60. Federation has been certified by the National Labor Relations Board ("NLRB") as the collective bargaining agent for all musicians, including orchestra leaders, who perform services for recording companies (Ex. BE).

61. Musicians perform services for recording companies on a single engagement basis (1527, 2757).

62. Recording companies are in the business of manufacturing phonograph records which embody musical performances of members of defendant unions (1465–66, 1504, 2752–53).

63. An employee of the recording company known as the "artist and repertoire representative" (the "A&R man") has the ultimate responsibility for the musical product embodied in the phonograph recording. He actively participates in and has the last word in determining the nature of the various elements which comprise the recorded performance. In exercising this control the A&R man generally consults with the arranger-conductor and/or the vocalist, if any (2754–62, 2768–69, 2770–72, 2775–76, 1482, 1496, 1499–1502, 1504–05, 1508–11, 1518–19, 1522).

(a) A substantial number, probably a majority, of the popular recordings made feature vocalists rather than orchestras (2754, 2769, 1523–24).

(b) The conductor of the orchestra used for recordings is also usually the arranger (2755, 1501–02).

64. The A&R man exercises the above-mentioned control over the following aspects of the preparation for the performance and the actual performance:

(a) selecting the orchestra leader (1501–02, 2754–55);

(b) determining the number and types of instruments to be used (1499–1501, 1518, 2754–55);

(c) employing a contractor to hire sidemen (the A&R man sometimes designates particular sidemen who are to be hired or avoided) (1518–19, 2756–58, 2762);

(d) deciding on the number and instruments of the musicians who are to perform (1503, 1518–19, 2754–56);

(e) determining the compositions to be played (1496, 1519–20, 2754–55);

(f) determining the seating arrangements and microphone placements for musicians (1504–05, 2758–60);

(g) determining when and where the actual recording session is to take place (1503–04, 2758, 2773); the recording session usually takes place at studios owned or leased by the recording company (id.);

(h) sometimes furnishing instruments to the musicians performing services (2764);

(i) determining the musical characteristics of the orchestra's performance including tempo, dynamics, tone coloring, volume, type of syncopation, and sometimes the nature of a sideman's performance (1508–11, 2761–62, 2763, 2775–76);

(j) sometimes requiring the addition of instrumentation to a recording after the original recording session ("sweetening"); often this subsequent sweeten-

ing takes place in the absence of the orchestra leader (1522).

65. All musical services must be performed to the satisfaction of the A&R man (1481–82, 1506–08, 1511, 2756, 2760, 2770, 2763). If the final recording does not meet with the approval of the A&R man, it will not be issued (1521, 2764).

66. The recording company pays compensation by individual checks payable to each of the musicians employed (2767–68, 2750; Ex. HP) or by a check payable to the leader or contractor for the total scale wages of leaders and sidemen which is transmitted to Local 802, less employer deductions (1491–91a, 1546–47, 2766–67). In the latter case, the recording company also sends a payroll record designating the gross and net amounts payable to each musician (id.; Ex. EN).

67. The recording company withholds and pays over to the appropriate governmental agencies federal and state withholding taxes and social security taxes for all musicians, including the orchestra leader. The recording company also pays disability insurance for each of the musicians, including the orchestra leader (1494, 2750, 2786; Ex. HP). The recording company makes contributions to a pension welfare fund on behalf of each musician, including the orchestra leader (Exs. BS, pp. 29–30, EQ–ES).

68. Featured artists enter into royalty contracts with recording companies. Under those agreements there are deducted from the royalties otherwise owing to the featured artist, production costs such as wages paid to an orchestra leader; wages paid to sidemen; costs of arranging and composing, and the wages of choral groups (1541–42, 2784–86). If there are no royalties or an insufficient amount of royalties, the recording company bears these expenses without reimbursement (1542, 2784).

69. The recording company enters into a Form B Contract with the orchestra leader with respect to each recording session at which phonograph records are made (2765–66, Exs. DH, HO), which provides that the "employer [record company] shall at all times have complete control over the services of employees under this contract and the leader shall, as agent of the employer, enforce disciplinary measures for just cause, and carry out instructions as to selections and manner of performance" (id.).

70. Cutler performed as a leader in the making of a recording (St.Min. 83–84). There is no evidence that Cutler's manner of performance and the degree of control by the recording company differed from that referred to above.

71. Paragraph 12(d) of the collective bargaining agreement between the recording companies and defendant unions provides (Ex. BS):

"All present provisions of the Constitution, By-Laws, rules and regulations of the Federation (except those relating to requiring membership in the Federation) are made a part of this agreement to the extent to which their inclusion and enforcement as part of this agreement are not prohibited by any presently existing and valid law. No changes in the Federation's Constitution, By-Laws, rules and regulations which may be made during the term of this agreement shall be effective to contravene any of the provisions hereof."

72. The recording company has genuine and effective control over the rendition of services by musicians engaged by it including the orchestra leader.

VIII. MINIMUM PRICE REGULATIONS

73. Local 802's "Price List" Booklet requires each sideman to be paid minimum wages for single or steady engagements. Their wages are based upon a number of factors, including the type of engagement involved; the number of hours played; whether the sideman plays more than one instrument; whether playing is continuous or non-continuous; whether the musician has to transport certain bulky instruments; whether the musician is required to furnish an organ or music folios; whether the musician is

required to rehearse; whether there is a show lasting more than twenty minutes; and whether uniforms (other than tuxedos) must be furnished by the musicians (Stipulated Fact 14).

74. Local 802's "Price List" Booklet requires each leader to receive certain minimum compensation for the services rendered by him. Thus, Rule 1 of the Price List Booklet provides as follows:

"RULE 1. 'Regulations for Establishing Leaders' Fees in Single Engagements Unless Otherwise Provided for.'"

"A. An engagement played by one member shall charge in addition to the Union Scale of the engagement 25 per cent additional as Leader (Personnel Manager) fee.

"B. An engagement played by two members shall charge in addition to the Union scale of the engagement 50 per cent additional as Leader (Personnel Manager) fee.

"C. An engagement played by three members shall charge in addition to the Union scale for the engagement 75 per cent additional as Leader (Personnel Manager) fee.

"D. Where four or more men are employed the Leader shall charge and receive double the regular scale, i. e., 100 per cent additional as Leader (Personnel Manager) fee." (Stipulated Fact 17)

75. Similarly, Local 802's "Price List" Booklet provides as to steady engagements:

"RULE 10. On all steady engagements the Leader (Personnel Manager) shall charge 25 per cent additional when only one (1) man is employed, 50 per cent additional when two (2) men are employed, 75 per cent additional when three (3) men are employed, and for all engagements of four (4) men or more he shall charge double the price per man, except where otherwise provided." (Stipulated Fact 18)

76. Local 802's "Price List" Booklet provides that the subleader shall receive

the following as his minimum wage for single engagements:

"Rule 2. In the absence of the Leader (Personnel Manager), the member representing him for any part or all of the engagement shall receive one-half the extra charge made in conformity with Rule 1, unless otherwise provided.

"A. On all outside (Single) engagements, on which the orchestra is called upon to rehearse and/or play a show and for which there is an extra charge. The Musician who actually conducts the rehearsal and/or show shall receive double the extra charge regardless as to who contracts the engagement, number of musicians employed or who stands in front of the orchestra." (Stipulated Fact 24)

77. Similarly, in connection with steady engagements the "Price List" Booklet provides:

"Rule 11. In the absence of the Leader (Personnel Manager) the member representing him for all or part of the engagement shall receive one-half the extra charge made in conformity with Rule 1, unless otherwise provided." (Stipulated Fact 25)

78. Thus, the subleader must receive as his minimum wages for conducting a four-piece band on a single engagement, one and one-half times the sideman's scale, or double the sideman's scale if a rehearsal or show is involved (Stipulated Fact 26).

79. Local 802 not only establishes minimum compensation for sidemen and orchestra leaders on single and steady engagements, but also requires orchestra leaders to charge purchasers prices which are not less than the aggregate of the minimum compensation payable to sidemen and leaders (Exs. 178, 179, 186–195; Stipulated Fact 27).

80. Other locals also set per man and leader minimum wages (Exs. 173–77).

81. The resolutions of May 17, 1960 and October 27, 1960:

(a) In the club date field establishments are classified by Local 802 as "Class A" or as "Special Class." Class A rates are higher than Special Class.

(b) In March 1960, resolutions were submitted by members of Local 802 for consideration at the April Price List meeting. One of the resolutions so submitted provided that the minimum scale wages of sidemen performing services on Class A club dates would be increased (Ex. Q).

(c) The April 1960 Price List meeting was scheduled to take place on April 18, 1960. Prior to the April Price List meeting, plaintiff Cutler, as well as other leaders, made known to Local 802 officers objections to the adoption of the proposed resolutions (1229–30, 1397–1402).

(d) The April Price List meeting was adjourned for lack of a quorum (Ex. LI). The Executive Board, on May 17, 1960, passed the resolutions referred to above, to become effective with respect to club date engagements booked after June 15, 1960 (Exs. LI and JQ). Such action was taken pursuant to a standing resolution in the By-Laws granting to the Executive Board authority to adopt price list resolutions where they were not acted upon at a price list meeting because of the absence of a quorum (3263; Ex. 12, Section 3, p. 57).

(e) After the increase in rates for club date Class A engagements became effective, members of Local 802 appeared and requested that Special Class engagement minimum rates be increased in order to maintain the traditional differential between Class A and Special Class club date engagements (3264–65).

(f) On October 29, 1960, the Executive Board adopted a resolution increasing the rates of Special Class club dates (Stipulated Fact 16; Ex. CE).

82. Local 802, in order to insure that minimum wages and other working conditions are being observed, employs approximately 30 business representatives whose function it is to visit establishments at which members of defendant unions are engaged (622–23, 666, 3834).

83. Local 802 also furnishes to its members in certain fields (e. g., the club date field, the broadcasting field) "Price List" booklets which set forth the minimum wages and working conditions in those fields.

## IX. MINIMUMS

84. Local 802 has regulations requiring the employment of minimum numbers of musicians for the various rooms of hotels, catering establishments and ballrooms in the club date single engagement field. These regulations vary according to the establishing, function, day and time and apply to all club date single engagements attended by more than 75 persons (Exs. 178–185; 3238–39).

85. Federation and Local 802 have been parties to collective agreements with the purchasers of music for certain steady engagements pursuant to which the purchasers have agreed to employ a specified number of musicians (Network Television Agreement, Ex. BL 1–3; Radio City Music Hall Agreement, Ex. BH; Philharmonic Agreement, Ex. BZ–1; Metropolitan Opera Agreement, Ex. CB).

## X. FORM B CONTRACT

86. Article 13, Section 33 of Federation's By-Laws provides:

"Members of the A. F. of M. are not permitted to sign any form of contract or agreement for an engagement other than that issued by the A. F. of M." (Ex. 300).

The form of contract issued by the AFM is the Form B Contract (Exs. Y, Z, EC).

87. The Form B Contract was first adopted in 1941 (Ex. Y, Art. XVI, pp. 170–79). It was recommended in order that orchestra leaders could qualify for social security benefits (3375). The language of the Form B Contract was formulated after discussions with the Treasury Department (Ex. EC 44–45) and then submitted to the Commissioner of Internal Revenue for a ruling on the question of liability for Social Security

taxes (Ex. EC 45–46). The Commissioner ruled that the hotel employing the musicians in question was the employer for purposes of the Social Security tax (Ex. EC 47).

88. Since 1941, the Form B Contract has been amended from time to time and at present there are various types in use for different types of engagements. Each type designates the purchaser of the music as the employer and the leader as an employee (Exs. Z, Z–1, Z–2, DF–DI).

89. Article 16, Section 1A of Federation's By-Laws, provides that on traveling engagements (Ex. 300):

"A. Any individual member, or leader, in every case before an engagement is played, must submit his contract for same to the local union in whose jurisdiction same is played, or in the absence of a written contract, file a written statement with such local fully explaining therein the conditions under which same is to be fulfilled, naming the place wherein same is to be played, the amount of money contracted for, the hours of the engagement, as well as the names of the members who will play same and the locals to which they belong, the actual amount of money paid each individual sideman, which cannot be less than the wage scale specified in Article 15 of these By-laws and (except in Canada) their Social Security numbers."

The written contract referred to is the Form B Contract (Ex. 300, Art. 13, § 33).

90. Local 802, in practice, does not require the use of the Form B Contract on club date single engagements; it accepts reports (in person, by telephone, or by mail) of details of the engagement sufficient to show that union scale has been complied with. It also accepts contracts other than Form B Contracts (656–63, 3597–99). In addition, it accepts contracts (Form B or other types) which specify as the total price or wage "union scale" rather than any dollar amount (3597–3604, 3837).

91. Local 802 does require the use of the Form B Contract on steady engagements, although it does not insist that a Form B Contract be filed prior to every engagement (665–66).

92. Any member failing to use the Form B Contract, where it is required in practice, is subject to penalty (Stipulated Fact 30).

93. Local 802 requires that an engagement as a leader shall not be effective unless first approved by the Executive Board (Ex. 165, Art. 4, § 5).

## XI. REGULATIONS PERTAINING TO TRAVELING MEMBERS

### A. 10% Surcharge

94. A tax called the "10% Traveling Surcharge" was assessed by the AFM on engagements played by members outside the jurisdiction of their home Local until 1964 (Ex. CM, Art. 15, § 1).

95. The 10% Traveling Surcharge was defined in the Constitution and By-Laws of the AFM as "An additional 10% based on the price of the Local in whose jurisdiction the engagement is being played * * * added to the price [of the engagement] * * *." (Ex. CM, Art. 15, § 3)

96. Federation's By-Laws provided that the leader was responsible for collecting and transmitting the traveling surcharge tax to Federation (Ex. CM, Art. 15, Sec. 7) and that the tax was to be distributed as follows: 4/10 was to be retained by Federation, 4/10 was to be paid to the local in whose jurisdiction the traveling engagement took place, and 2/10 was to be distributed to members of the orchestra playing the engagement (id.).

97. In April 1963, AFM's 10% Traveling Surcharge tax as it was then administered was held by the Second Circuit to violate Section 302 of the IMRDA in Cutler v. AFM, supra.

98. Federation's June 1963 Annual Convention adopted a resolution abolishing the traveling surcharge tax, effective January 1, 1964 (Ex. LG).

99. At the June 1963 Convention, a new 10% wage differential on traveling engagements (the "traveling engagement wage differential") was adopted. Article 15 of the 1964 Federation By-Laws provides that in the case of a steady traveling engagement the "minimum wage to be charged and received by any member" shall be "no less than the wage scale of the local in whose jurisdiction the services are rendered, plus 10% of such local wage scale"; and that, in the case of a single engagement, the minimum wage to be charged and received shall be "no less than either the wage scale of the local in whose jurisdiction the services are rendered or the wage scale of the home local of the member performing such services, whichever is greater, plus 10% of the wage scale of the local in whose jurisdiction the engagement takes place." (Ex. 300, Art. 15, § 2)

100. The purpose of the traveling engagement wage differential is to protect work opportunities for local musicians within their respective local union jurisdictions (3675, 3725–28).

B. *Illustration of Application of the Traveling Engagement Wage Differential-Engagements Performed by Local 802 Members in Local 38 Westchester*

101. The Local 802 scale for club dates is higher than the union scale in the jurisdiction of Local 38, Westchester County, New York (741).

102. Pursuant to Article 15, Section 2 of Federation's By-Laws, members of Local 802 who perform club date single engagements in the jurisdiction of Local 38 in Westchester County are required to charge the Local 802 scale plus 10% of the Local 38 scale (Ex. 300).

103. As a result of the higher Local 802 scale and the 10% wage differential, the minimum union scale price which must be charged by a Local 802 orchestra leader performing in the jurisdiction of Local 38 is higher than the minimum union scale price which must be charged by a Local 38 leader performing in the same jurisdiction.

104. Notwithstanding the differential in scale price in favor of Local 38 members, Local 802 members, including plaintiff Cutler, have performed engagements in the jurisdiction of Local 38, both prior and subsequent to 1960 increases in Local 802 scale (Exs. GK–GT, HE, HF, LI, JQ, CE, GK–GR; 2572–91; Stipulated Fact 16). Plaintiff Cutler, both before and after the 1960 increases in Local 802 scale, almost without exception, bid for jobs in Westchester at prices in excess of union scale (2587–90).

C. *Restrictions on Job Solicitation by Traveling Members*

105. Under Federation's By-Laws a traveling member performing a steady traveling engagement is not permitted to solicit or accept a single engagement either in or out of the jurisdiction in which the steady engagement is being played during the tenure of the steady engagement (Ex. 300, Art. 17, § 14).

106. Under Federation's By-Laws, a member of a Local may not form a traveling orchestra to compete with or fill engagements in his home local (Ex. 300, Art. 17, § 24). For example, a member of Local 802 may not form an orchestra to perform an engagement within Local 802's jurisdiction unless that orchestra consists entirely of members of Local 802.

107. Traveling orchestras which establish headquarters in the jurisdiction of any Local are not permitted to compete for or accept and play engagements in that jurisdiction (Exs. CM, 300, Art. 17, § 23).

108. An out-of-town orchestra leader playing a steady engagement in a particular jurisdiction is prohibited from playing a single engagement in that jurisdiction for some other client during the period of the steady engagement (Exs. CM, Art. 17, § 14; 300, Art. 17, § 14) or remain in the jurisdiction after completing a steady engagement to solicit another steady engagement (Exs. CM, Art.

17, § 17; 300, Art. 17, § 17). Nor may members of a traveling orchestra be used by the manager of a company with which they travel, or by the local employer, to displace the local orchestra or any member thereof, if the displacement interferes with the contract under which the local orchestra is employed (Exs. CM, Art. 16, § 31; 300, Art. 16, § 27).

109. A traveling band may not play a radio or TV engagement which is local in character (not on a network) (Ex. CM, Art. 23, § 1).

### D. The Local Work Dues Equivalent

110. Since January 1, 1964, Federation's By-Laws have provided for the payment by traveling members of local work dues equivalents to locals which require such payments. Local work dues equivalents are payments equal in amount to the work taxes which locals impose upon their own members in connection with earnings from jobs performed within the jurisdiction of such locals. Such payments are based upon a percentage of the members' earnings from such jobs (Ex. 300, Art. 2, § 8(c)).

111. Prior to January 1, 1964, Federation's By-Laws provided that traveling members could not be required to pay local work dues equivalents on engagements to which the Federation traveling surcharge tax applied (Ex. CM, Art. 16, § 26).

112. Under Federation's By-Laws, local work dues equivalents may be imposed only by a local which "uniformly requires its own members to pay the same percentage of their scale wages in connection with the rendition of the same classification of services." (Ex. 300, Art. 2, § 8(c)). Local work dues equivalents may not exceed 4% of the scale wages and may not be imposed on wages of traveling members "derived from symphony or opera services." (Ex. 300, Art. 2, § 8(E), (F)).

### E. Transfer Members

113. Under Federation's By-Laws, a member of one local who moves his residence to a place within the jurisdiction of another local and who indicates his wish to become a member of such other local, is called a transfer member (Ex. 300, Art. 14); and Federation locals are required to accept applications to grant full membership to transfer members who have resided in their jurisdictions at least six months (id., § 2).

114. Under Federation's By-Laws, Art. 14, a transfer member may not solicit or perform any steady engagement within that local's jurisdiction for a period of three months after the date he is granted transfer membership (id., § 7). He is also prohibited from performing engagements outside the jurisdiction of the transfer local, except that he may do so with orchestras consisting of members of the transfer local after three months (id., §§ 8, 9).

## XII. BOOKING AGENTS

115. Persons who act as "bookers, agents, representatives and managers of members, orchestras or bands, or who secure engagements and contracts for such members, orchestras and bands" are referred to as "booking agents" (Ex. 300, Art. 25, § 1).

116. Since 1936, Federation has required booking agents to enter into license agreements with Federation as a condition to representing or acting in behalf of Federation members (3370–73; Ex. JX).

117. Pursuant to the provisions of Federation's By-Laws, each such booking agent must enter into a standard form of license agreement with Federation under which he agrees not to charge more than a 10% commission on steady engagements, a 15% commission on single engagements, not to book non-union musicians, and not to book orchestras for less than union scale wages and working conditions (3373–74; Ex. 300, Art. 25, pp. 151–59). Federation makes no charge for the license agreement (533, 999).

118. The regulation of booking agents was considered at Federation's 1936 Convention. At that time, many booking agents charged exorbitant fees to members and booked engagements for musicians at wages which were below union

scale (1016–17, 1121–24, 3370–73). The President's report made at that Convention stated (Ex. JX):

"Many booking offices or agents do not now charge the standard wage for musicians and, in other cases where they do so, same is not paid to the musicians. This condition could only develop with the connivance of some contracting members or leaders who, in collusion with agents, frustrate the efforts of the union to enforce its wage scale. These leaders, or contracting members, by thus violating the laws of their organization, gain an advantage over other leaders in securing employment. As a result, a great percentage of the orchestras doing jobbing work or filling casual engagements, play for less than the union scale, and, in cases where the union tries to control the situation through the deposit of contracts with the union, false contracts are often deposited."

119. Following the submission of that report, Federation adopted provisions relating to booking agents which are substantially the same as those presently in effect (3370–74). Subsequent to the adoption of the regulations governing booking agents, the abuses just referred to were, to a large extent, eliminated (1017, 1123–24).

## XIII. Caterers

120. Many club date single engagements take place in catering halls which are rented by purchasers of the music. Catering halls do not supply orchestras, but some proprietors of catering halls recommend particular orchestras to prospective purchasers and receive commissions from the orchestra leaders (757–59, 773–74, 2350–55, 2361–63, 3246–48).

121. Local 802's By-Laws contain the following standing resolution (Ex. CJ, pp. 75–76):

"A. Caterers, banquent managers and others connected directly or indirectly with halls, hotels and all similar establishments which provide facilities for public or private functions, are prohibited from engaging leaders or musicians, for such affairs.

"B. Caterers or establishments violating the above may be placed on the Unfair List for such time and under such conditions as shall be determined by the Executive Board.

"C. The payment or promise of payment, or any gift or consideration whatever, to the above is contrary to the principle of fair competition among members of this local, and any member guilty of such offense shall be fined not more than Five Hundred Dollars ($500.-00) or suspended, or both."

This standing resolution has been in effect for approximately fifteen years (3246).

122. In 1947, prior to the adoption of the By-Laws relating to caterers, Local 802 appointed a committee to investigate conditions in hotels and catering halls. The committee's preliminary report, which was printed in the February 1947 issue of ALLEGRO, stated (Ex. JN):

"The objective of this committee's important assignment can be stated simply: the elimination of the caterer from the music business and the restoration to the musician of his right to earn a living without any restrictions and pressures upon him. Your committee believes, and knows that in that belief it reflects the unanimous opinion of the membership, that all money spent for music should go to musicians and not to chiselers. We oppose any caterer booking orchestras because that obviously leads to a depressing of union scales. The caterer must be barred from compelling people to use a specific orchestra."

The committee found evidence of "monopoly" and "collusion."

## XIV. COLLECTIVE BARGAINING

123. Defendant unions do not bargain collectively with purchasers of music or with orchestra leaders with respect to wages and working conditions applicable to single engagements (26, 252–54, 3262; St.Min. 581–82).

124. Defendant unions have for many years bargained collectively with purchasers of music in various non-club date fields (2984–95). Thus, there are presently in effect (or have recently expired and are in the process of negotiation), among others, the following collective agreements to which either or both of the defendant unions are parties:

(a) Collective agreement between Federation and phonograph recording companies, effective January 1, 1959 (Ex. BS).

(b) Collective agreements between Federation and both NBC and CBS covering network radio and television, dated May 18, 1964 (Ex. BL–1, BL–3).

(c) Collective agreements between Federation and both NBC and CBS covering local radio and television, dated May 18, 1964 (Ex. BL–2, BL–4).

(d) Collective agreement between Federation and television film producers (blank form) (Ex. BM).

(e) Collective agreement between Federation and various makers of television video tape, effective July 1, 1964 (Ex. HX).

(f) Collective agreement between Federation and television film producers (Ex. HY).

(g) Collective agreement between Federation and television producers relating to pay television motion pictures (Ex. HZ).

(h) Collective agreement between Federation and television video tape producers (Ex. BN).

(i) Collective agreement between Federation and Independent Motion Picture Producers (Ex. BO).

(j) Collective agreement between Federation and Producers of Non-Theatrical Documentary & Industrial Films (Ex. BQ).

(k) Collective agreement between Federation and advertising agencies covering television and radio commercial announcements (Ex. BT).

(l) Collective agreement between Federation and producers of electrical transcriptions (Ex. BV).

(m) Collective agreement between Local 802 and The League of New York Theatres, Inc., dated June 25, 1964 (Ex. BI).

(n) Collective agreement between Local 802 and Shubert Interests Operating Legitimate Theatres in New York City, dated September 2, 1963 (Ex. BJ).

(o) Collective agreement between Local 802 and both American Export Lines Inc. and United States Lines Co., dated April 24, 1963 (Ex. IB, IB 1).

(p) Collective agreement between Local 802 and Radio City Music Hall, dated September 30, 1963 (Ex. BH).

(q) Collective agreement between Local 802 and The Metropolitan Opera, dated July 1, 1961 (Ex. CB).

(r) Collective agreement between Local 802 and the Philharmonic-Symphony Society of New York (Ex. BZ, BZ 1).

(s) Collective agreement between Local 802 and New York City Opera, dated March 12, 1962 (Ex. BX).

(t) Collective agreement between Local 802 and New York City Ballet, dated March 1, 1962 (Ex. BY).

(u) Collective agreement between Local 802 and Music Publishers Protective Ass'n, Inc., dated September 21, 1964 (Ex. IC).

(v) Collective agreement between Local 802 and hotels or restaurants (Ex. BK).

(w) Collective agreements between Local 802 and Cafe Geiger dated November 16, 1962, with letter of correction dated April 17, 1963 annexed (Ex. IA).

(x) Collective agreement between Local 802 and Michael Gaynor, regarding Flatbush Terrace, dated January 24, 1964 (Ex. CV).

(y) Collective agreement between Federation and the three major networks relating to TV film, dated as of May 1, 1964 (Ex. IO).

(z) Collective agreement between Local 802 and National Broadcasting Company, Inc., dated August 5, 1955 (Ex. IP).

(aa) Collective agreement between Local 802 and WNEW Radio New York, dated July 23, 1964 (Ex. KL). Similar agreements have been entered into with other stations (Exs. KJ, KK).

125. The collective agreements referred to above set forth the hours and working conditions of all musicians, including orchestra leaders, covered by those agreements. Those agreements were the result of negotiations between Federation or Local 802, or both of them, and the purchasers of music, or an association of purchasers of music (2995, broadcasting 2258–66; theatres 2992–93; steamships 3225–27; Radio City Music Hall 3020–22; Metropolitan Opera 2852–55; New York Philharmonic 3192–3; New York City Center Opera 2992; New York City Center Ballet 2992; hotels, restaurants and nightclubs 2988–89, 2991–92, 3197–3205, 3210, Exs. IT–JB).

126. Defendant unions, before bargaining collectively with the purchasers of music, conducted meetings of their members to formulate the demands to be bargained for (hotels, restaurants and nightclubs, 3214–17, Ex. JC; Yorkville restaurants, 3224; steamships, 3226; theatres, 3283). No special invitations were sent to orchestra leaders to participate in the negotiations with the purchasers of the music (891–892, 1060). Upon completion of negotiations with purchasers, but prior to the execution of the collective agreement, members of defendant unions were given the opportunity to approve or disapprove of the proposed agreement (television networks 3183–4, Ex. II; recordings 3184–5, Ex. JT; television film 3186–87, Ex. IN; Radio City Music Hall 3022; New York Philharmonic-Symphony Society of New York, Inc. 3193; hotels, restaurants and nightclubs 3219–3222, 3225, Ex. JD).

## XV. MONOPOLY

127. Defendant unions endeavor to foreclose non-union orchestras or leaders from the music field principally by not permitting members to play in the same orchestra as non-members (Ex. 300, Art. 13, §§ 5–7; Art. 18, § 26; Ex. 165, Art. 4, § 1(h)), by not permitting members to deal with unlicensed booking agents (Ex. 300, Art. 25, §§ 4, 22), by not permitting licensed booking agents to book engagements for non-members (Ex. 300, Art. 25 at p. 151), by securing the cooperation of television companies (2314–15), record companies (1469) and hotels (1704–06, 2341) in not hiring non-union bands and by precluding non-members from entering Local 802's exchange hall where sidemen are hired for engagements (2108).

## DISCUSSION

## I. CLASS ACTION

Plaintiffs claim that they represent a class of orchestra leaders largely engaged in the single engagement field who (a) are employers who regularly employ sidemen or employee musicians who are members of AFM, Local 802, or another Local affiliated with AFM; and (b) are independent contractors largely engaged in the single engagement field. (Complaints, 60 Civ. 2939, par. 24; 60 Civ. 4926, par. 17) It is also alleged that "this complaint raises common rights; and a common relief is sought herein; and the object of this action is the adjudication of claims which do or may seriously affect the specific property rights of plaintiffs and of said class * * *." (Complaints, 60 Civ. 2939, par. 23; 60 Civ. 4926, par. 16)

The class action is defined in Rule 23 (a), Federal Rules of Civil Procedure:

"Representation. If persons constituting a class are so numerous as to make it impracticable to bring

them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

"(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

"(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

■■■ The three categories of class actions in Rule 23(a), (b), (c) are called respectively "true," "hybrid" and "spurious." Under the prevailing view a judgment in the true class action is conclusive on all members of the class represented, in a hybrid class action on all members of the class as to rights in the res, and in a spurious class action on only the persons named as parties. Dickinson v. Burnham, 197 F.2d 973, 979 (2d Cir), cert. denied, 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952) and cases cited. Since Hansberry v. Lee, 311 U.S. 32, 43, 61 S.Ct. 115, 85 L.Ed. 22, 132 A.L.R. 741 (1940), commentators have urged the abolition of these distinctions in the effect of a judgment in the three types of class suits. Dickinson v. Burnham, supra, 197 F.2d at 979. The view advocated is reliance on the test of adequate representation to determine whether absent parties should be bound. Rank v. Krug, 142 F.Supp. 1, 154 n. 93 (D.Cal. 1956), modified on other grounds, State of California v. Rank, 293 F.2d 340 (9th Cir. 1961), modified on other grounds, Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15; City of Fresno v. State of California, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963).

■■■ These divergent views have important practical ramifications. Since under the current view only the parties to the action are bound in a spurious class action, the issue of whether they adequately represent a class is only important as it relates to the right to intervene York v. Guaranty Trust Co. of N. Y., 143 F.2d 503, 528, n. 52 (2d Cir. 1944), rev'd on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231 (1945). It is merely a device for permissive joinder. Carroll v. Associated Musicians of Greater New York, 206 F. Supp. 462, 469–470 (S.D.N.Y.1962), aff'd, 316 F.2d 574 (2d Cir. 1963).

■ Nevertheless, I find that plaintiffs fail to adequately represent the class they purport to represent. This suit is part of a series of suits in which the same orchestra leaders are leading a challenge to various union activities. The present suit challenges many phases of union regulation. If successful in all respects it would substantially weaken the union. It would not be surprising if there was a division among the orchestra leaders in the union on this subject. The complaints themselves indicate that some orchestra leaders willingly cooperate with the union (e. g., Complaint, 60 Civ. 4926, pars. 24, 25, 41). Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115 (1940); Giordano v. R.C.A. 183 F.2d 558 (3rd Cir. 1950).

This question of conflict among the members of the proposed class was treated in three prior decisions involving musicians unions. In all, it was a basis for rejecting the propriety of a class suit. Associated Orchestra Leaders of Greater Phila. v. Philadelphia Musical Soc. etc., 203 F.Supp. 755, 757 (E.D.Pa.1962); Cutler v. AFM, 211 F.Supp. 433, 444–445 (S.D.N.Y.1962), aff'd, 316 F.2d 546 (2d Cir.), cert denied, 375 U.S. 941, 84 S.Ct. 346, 11 L.Ed.2d 272 (1963); Carroll v. Associated Musicians of Greater New York, supra, 206 F.Supp. at 470–471.

Moreover, the plaintiffs do not adequately represent certain orchestra lead-

ers whom they purport to represent. They lack certain characteristics that distinguish "name" bands:

(1) Distinctive musical styles based on the arrangements used by the band and, perhaps, the style of the leader as a soloist;

(2) National reputations; and

(3) Leaders who always appear and never use subleaders.

These characteristics would be relevant in any evaluation of the status of the name bandleaders under the antitrust laws.

The class suit or at least the representation of persons other than the parties to the suit fails on other grounds.

Rule 23(a) (1) requires that members of the class have a joint, common, or secondary right. The present suit clearly does not qualify, since the rights sought to be enforced are several and not secondary or derivative in nature.

Rule 23(a) (2) permits a class action where the rights of the members of the class are several and the action involves claims to specific property. No specific property will be affected by the present suit, hence, this provision is ineffective as support for a class suit here.

Rule 23(a) (3) provides for the spurious class suit. As was observed earlier, such a suit binds only the parties to the action and is efficacious only as a device for permissive joinder. Therefore, it is irrelevant whether this suit qualifies as a spurious class suit since no questions of joinder are now presented. Whether or not a spurious class action, only the parties will be affected. See Moore, 3 Federal Practice 3444–45, 3465 (2d ed. 1964).

Therefore, this action will be treated as affecting only the actual parties.

## II. ALLEGED ANTITRUST VIOLATIONS

The plaintiffs charge that the following acts of defendants violate the antitrust laws:

(1) pressuring orchestra leaders into the union;

(2) imposing minimum price regulations on orchestra leaders;

(3) imposing minimum numbers of sidemen requirements on orchestra leaders;

(4) requiring the use of the Form B Contract;

(5) imposing restrictions on traveling orchestras;

(6) failing to bargain collectively;

(7) regulating booking agents and caterers;

(8) monopolizing the music industry.

The plaintiffs' position as stated in the complaints is that these acts constitute a violation of the antitrust laws because they represent a combination between a union and orchestra leaders, including the unwilling plaintiffs, in restraint of trade.

## III. ANTITRUST—LABOR LAW

With the benefit of "the light shed by the Norris-LaGuardia Act on the nature of the industrial conflict" the Supreme Court first stated the current extent of organized labor's liability under the antitrust laws in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). The Court read "the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct." Id. at 231, 61 S.Ct. at 466.

Exercising logic which has been much discussed since the decision, the court stated: "The Norris-LaGuardia Act reasserted the original purpose of the Clayton Act by infusing into it the immunized trade union activities as redefined by the later Act," id. at 236, 61 S.Ct. at 468, and concluded that "[s]o long as a union acts in its self-interest and does not combine with non-labor groups" the conduct enumerated in Section 20 of the Clayton Act was not a violation of the Sherman Act.

The statement of the exemption was further developed in Allen Bradley Co. v. Local 3, International Bhd. of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). The court said that the Norris-LaGuardia Act "emphasized

the public importance under modern economic conditions of protecting the rights of employees to organize into unions and to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid and protection.' " Id. at 805, 65 S.Ct. at 1538. However, the court held that unions could not, "consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services." Id. at 808, 65 S.Ct. at 1539.

The meaning of the term "non-labor" group has been developed in a series of cases dealing with the issue of whether a union could organize and regulate independent contractors. Los Angeles Meat Drivers Union etc. v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962); Milk Wagon Drivers Union etc. v. Lake Valley Farm Prods., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940); United States v. Fish Smokers Trade Council, Inc., 183 F.Supp. 227 (S.D.N.Y.1960); Cf., Bakery Drivers Union etc. v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178 (1941). Applying the Norris-LaGuardia Act, a search was made in these cases for a "labor dispute" within the meaning of that Act to determine whether an exemption from the Sherman Act was available. The criterion used was the presence of a job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors. If such a relationship existed the independent contractors were a "labor group" and party to a labor dispute under the Norris-LaGuardia Act. Hence, the Sherman Act was inapplicable to any combination between the union and the independent contractors.

■ The ultimate issue in determining whether a relationship exists which would exempt conduct complained of from the Sherman Act is whether the work and functions performed by the independent contractors actually or potentially affect the hours, wages, job security or working conditions of the union members in the same industry. If so, the union may combine with the independent contractors by including them in the union and subjecting them to union regulation. Los Angeles Meat Drivers Union etc. v. United States, supra; United States v. Fish Smokers Trade Council, Inc., supra, 183 F.Supp. at 234.

■ Since the scope of the union exemption from the Sherman Act is defined by its self-interest in collective bargaining and protecting and improving conditions of employment, the activities complained of by plaintiffs will be proper if they relate to such legitimate union interests and are not carried on in combination with a non-labor group. "[T]he same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups." Allen Bradley Co. v. Local 3, International Bhd. of Electrical Workers, supra, 325 U.S. at 810, 65 S.Ct. at 1540.

## IV. LABOR OR NON-LABOR GROUP?

A glance at the list of alleged illegal practices suggests that the legality of two of them depends on whether the plaintiffs comprise a non-labor group. This issue will be examined prior to considering the legality of the individual practices.

If employees, the plaintiff orchestra leaders are certainly a labor group. If employers or independent contractors, they will be a labor group only if they meet the test of job or wage competition or other economic interrelationship which was just discussed. For the purposes of examining the status of the orchestra leaders under the antitrust laws in the club date and hotel steady engagement fields, it will be assumed, without deciding, that they are employers or independent contractors. See Cutler v. AFM, supra; Carroll v. Associated Musicians of Greater New York, supra.

### A. Club Date and Hotel Steady Engagement Fields

■ I find that in the club date and hotel steady engagement fields the plaintiff orchestra leaders are in competition with employee members of the defendant unions regarding jobs, wages and other

working conditions. As a result, they comprise a labor group in these fields.

The evidence in this case discloses that plaintiffs made a practice of leading their own bands and, except for Peterson, often played instruments too. They also regularly booked more than one engagement for an evening, in which case they used subleaders to direct their orchestras.

In operating in this manner plaintiffs perform functions identical to acknowledged employees who were also union members—subleaders and sidemen. Moreover, when one of the plaintiffs personally led his band he occupied a job that was a potential position for a subleader. When a plaintiff played an instrument as well as conducted, he filled a slot that was a potential job for a sideman and also displaced a subleader.[2] In displacing sidemen and subleaders from potential jobs, plaintiffs engaged in job competition with them.

As a consequence of this relationship, the practices of plaintiffs when they lead and play must have a vital effect on the working conditions of the non-leader members of the union. If they undercut the union wage scale or do not adhere to union regulations regarding hours or other working conditions when they perform they will undermine these union standards. They would put pressure on the union members they compete with to correspondingly lower their own de-

mands. The evidence disclosed that plaintiff Levitt actually did lead a band at a steady engagement at a dance hall for which he received less than the subleader's union minimum wage. (3323–24)

### B. Other Fields (Television, Recording and Concerts)

Although virtually all of the plaintiffs' time is used in playing club dates and hotel steady engagements, for the sake of completeness the other fields in which plaintiffs have engaged will now be considered.

Plaintiff Cutler has made one or two recordings and has had a television engagement. Plaintiff Peterson has had some concert engagements.

In the concert field there is not sufficient evidence from which findings can be made either as to the status of Peterson as an employee or independent contractor, or as to the existence of job or wage competition. He has not met his burden of proof in this regard.[3]

In the television and recording fields the evidence is inadequate to support findings as to job or wage competition. Further, an orchestra leader's status here is quite different from his position in the club date or hotel steady engagement field. It is not fruitful to assume that they are independent contractors. Therefore, in order to determine whether

2. If a subleader could be found who played the instrument usually played by the leader, then only a potential subleader's job would be lost.

3. It is unlikely that Peterson could show an antitrust violation in the concert area. His status in this field is relevant to two charges: pressuring leaders into the union and fixing minimum prices.

Since leading at concerts constitutes only a very small percentage of Peterson's activities and the rest of his business is conducted in a manner which justified the pressure to join the union, the fact that Peterson might be a "non-labor" independent contractor in the concert field is immaterial. The union would still be entitled to attempt to induce or force him to join.

Further, if Peterson only organizes the concerts and does not personally conduct

or play, as has been his practice since expulsion, he has failed to establish that in this capacity pressure was, in fact, exerted on him to join the union. See V, infra. If Peterson actually conducts at the concerts, then it is likely that he is in job and wage competition with subleaders and a member of a labor group. As such, he would be a proper subject for unionization. See V, infra.

Regarding the charge of minimum price fixing, if Peterson does not conduct or play at concert engagements, this charge would be treated the same as it would in the club date or hotel steady field. See VI, infra. There would be no antitrust violation. If Peterson does conduct at concert engagements, as stated above, he would probably be a member of a labor group and a proper subject for union regulation.

plaintiff Cutler was included in a non-labor group in these areas it will be necessary to consider whether he is an independant contractor or an employee.

This issue must be resolved by examining the degree of control which is exercised over the details of the service rendered by the orchestra leader and the factors which make up the economic reality of the relationship, e. g., "that permanency of the relation, the skill required, the investment in the facilities for work and opportunities for profit or loss." Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947, 172 A.L.R. 317 (1947); United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

In contrast to the role of the orchestra leader in the single engagement field, Cutler v. United States, 1960, 180 F.Supp. 360, 148 Ct.Cl. 537, the evidence discloses that in television and recording the orchestra leader is subject to considerable artistic supervision. An employee of the television or record company is charged with directing the performance and seeing that a product which fits the company's idea of a saleable item is produced. Usually the orchestra is integrated into a larger product which again must meet company standards. The television or recording company also selects the sidemen and pays them. The orchestra leader does not bear the risk of loss in the enterprise and generally does not have an interest in the profits (unless he is the featured artist on a recording). The facilities other than the instruments used, and occasionally even instruments, are furnished by the recording or television company.

After reviewing all the evidence of the relationship between the orchestra leader and the television or recording company, and principally for the above reasons, I conclude that in the television and recording fields the plaintiff Cutler is an employee. See American Broadcasting Company, 134 N.L.R.B. 1456 (1961). I make no finding as to big-name bands, which, as I noted earlier, are not represented among the plaintiffs.

The two practices complained of by plaintiffs with respect to which the status of the orchestra leaders as a labor group is relevant are: (1) pressuring plaintiffs into joining the union; (2) fixing minimum leaders' fees and minimum engagement prices.

## V. PRESSURING OF ORCHESTRA LEADERS INTO JOINING THE UNION

It is clearly permissible for a union to pressure a group of independent contractors comprising a labor group into joining the union. Los Angeles Meat and Provision Drivers, etc. v. United States, 371 U.S. 94, 103, 83 S.Ct. 162, 9 L.Ed. 2d 150 (1962). Picketing was upheld as a means of inducing independent contractors comprising a labor group to join a union in Milk Wagon Drivers Union v. Lake Valley Farm Prods., Inc., supra, and an agreement foreclosing all but union jobbers from the smoked fish industry which was directed to forcing jobbers into the union was held to violate the Sherman Act in United States v. Fish Smokers Trade Council, Inc., supra, only because the jobbers were found to comprise a *non-labor* group.

In a decision relating to the AFM, United States v. AFM, 47 F.Supp. 304 (N.D.Ill.1942), aff'd, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120 (1943) (per curiam), the Supreme Court held the union's attempt to "eliminate all musical performances over the radio except those presented in person by members of the American Federation of Musicians," id., 47 F.Supp. at 307, to be exempt from the Sherman Act by virtue of the Norris-LaGuardia Act. See National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1958). By limiting employment to union members, a union is, of course, coercing nonunion workers to join it. Since the former is permissible, the latter certainly is.

There is no evidence in the record to indicate that the unionization of the plaintiffs was other than a matter of independent union action motivated by union self-interest. Allen Bradley Co. v.

Local 3, International Bhd. of Electrical Workers, supra, 325 U.S. at 811, 65 S.Ct. 1533, 89 L.Ed. 1939; United States v. Hutcheson, supra, 312 U.S. at 232, 61 S.Ct. 463, 85 L.Ed. 788.

In conclusion, since the plaintiffs are a labor group in the club date and hotel steady engagement fields, the defendants do not violate the antitrust laws in pressuring them into membership.

Since their expulsion from the defendant unions, Carroll and Peterson have not personally led or played at their engagements. They merely book and organize them. In this capacity they do not compete with sidemen or subleaders and the basis of the conclusion that they are a labor group falls. However, the union does not significantly hinder them from carrying on their business in this fashion. (See F.F. 12, 127) Insofar as they do not themselves conduct or play, the charge of pressuring them into the union has not been sustained.

In the television and recording fields, the union is unquestionably free to pressure orchestra leaders like plaintiffs into membership since they are employees.

## VI. FIXING MINIMUM PRICES CHARGED BY LEADERS

The minimum prices set by the union are equal to the total minimum wages of the sidemen employed plus a leader's minimum fee. If the leader does not participate in the engagement but employs a subleader, then a prescribed portion of the leader's fee goes to the subleader. The remaining fraction of the leader's fee goes to the leader. In reciting the extra charges to be paid a leader, the union Price List booklet refers to the leader in parenthesis as a "personnel manager."

In view of the competition between leaders and sidemen and subleaders which underlies the finding that the leaders are a labor group, the union has a legitimate interest in fixing minimum fees for a participating leader and minimum engagement prices equal to the total minimum wages of the sidemen and the participating leader. Any cuts by participating leaders of their fees below union minimums or in the price of an engagement below a union minimum equalling the total minimums of the participants puts an obvious downward pressure on the wages of subleaders and sidemen (e. g., 1122).

The legitimacy of the concern of the union in fixing the minimum prices to be charged by a group of independent contractors comprising a labor group was upheld in Local 24, International Bhd. of Teamsters etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1958). The Supreme Court reversed a decision by the Ohio Supreme Court in which a collective bargaining agreement fixing the minimum rental prices of driver-owned trucks was held to constitute a violation of the Ohio antitrust law as a combination between the union and a non-labor group to fix prices. The Supreme Court held that the rental price of driver-owned trucks was a proper subject of bargaining under the National Labor Relations Act in view of the purpose of the provision to protect the wage scale of employee-drivers as well as to provide a decent income to the owner-drivers.

In Milk Wagon Drivers Union etc. v. Lake Valley Farm Prods., Inc., supra, the Supreme Court held the Sherman Act inapplicable to a union's efforts to organize a group of "vendors" who owned their own trucks and bought milk for resale to retail stores. The union's purpose was to improve the working conditions and "wages" of the vendors and to thereby protect the standards of the employee-drivers.

The question of whether the union can also provide a certain minimum compensation for "personnel managing" services to leaders who merely arrange an engagement (e. g., solicit it and organize the band) without participating in it, and insure a similar payment above the regular subleader's fee when they do participate is more difficult. Indeed, as noted earlier, Carroll and Peterson do not now personally lead at their engage-

ments, but merely arrange them. The leader who performs the necessary functions of soliciting and organizing engagements also negotiates the price of the engagement with the purchaser of the music. It is unquestionably true that skimping on the part of the person who sets up the engagement so that his costs are not covered is likely to have an adverse effect on the fees paid to the participating musicians. By fixing a reasonable amount over the sum of the minimum wages of the musicians participating in an engagement to cover these expenses, the union insures that "no part of the labor costs paid to a [leader] would be diverted by him for overhead or other non-labor costs." Greenstein v. National Skirt & Sportswear Ass'n, Inc., 178 F.Supp. 681, 689 (S.D.N.Y.1959).

In Greenstein v. National Skirt & Sportswear Ass'n, Inc., supra, the status of an analogous agreement between a union and manufacturers of ladies clothing to the effect that the manufacturers pay to contractors who produce their garments an amount at least equal to the combined wages of the contractor's employees and a reasonable amount to cover overhead was in issue on a motion for preliminary injunction. The court concluded that the agreement did not violate the Sherman Act without proof that it was a result of a conspiracy to restrain trade between the employer and the union. "If these protective clauses were demanded and obtained by the Union * * as a matter of independent action in furthering the welfare of the employees they represent, then the Allen Bradley case * * * is inapposite." Id. at 689. Allen Bradley Co. v. Local 3, International Bhd. of Electrical Workers, supra, 325 U.S. at 811, 65 S.Ct. 1533; United States v. Hutcheson, supra, 312 U.S. at 232, 61 S.Ct. 463.

There is no evidence in this record to indicate that the minimum price lists were sought by the union as part of a conspiracy in which the union aided "non-labor groups to create business monopolies and to control the marketing of goods and services." Allen Bradley

Co. v. Local 3, International Bhd. of Electrical Workers, supra, 325 U.S. at 808, 65 S.Ct. at 1539. Nor is there any evidence which indicates that the increment to the personnel manager is unrelated to his costs in that function. I conclude that the union's price lists do not violate the Sherman Act.

In recording and television, subleaders are apparently not used and the leader's fee would go to the actual conductor. It is perfectly permissible for the union to negotiate a minimum wage for leaders in these fields since they are employees.

The legality of the other acts charged to be violations of the antitrust laws may be considered without regard to the status of the plaintiffs as a labor group. In all of the following matters there is no evidence to indicate that the defendants acted other than independently in their own self-interest. Allen Bradley Co. v. Local 3, International Bhd. of Electrical Workers, supra, 325 U.S. at 811, 65 S.Ct. 1533; United States v. Hutcheson, supra, 312 U.S. at 232, 61 S.Ct. 463.

## VII. REFUSAL TO BARGAIN

The defendant unions do not bargain collectively either with orchestra leaders or purchasers of music in the club date single engagement field. Insofar as the antitrust laws are concerned, it is not illegal for a union to refuse to bargain with an employer or a group of employers. Hunt v. Crumboch, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945). Therefore, even assuming that the orchestra leaders are employers in the single engagement field, defendants have committed no violation of law by failing to bargain with them.

## VIII. IMPOSING MINIMUM EMPLOYMENT QUOTAS

The defendants have succeeded in imposing minimum numbers of men as requirements on various types of engagements. Minimum quotas are included within the exemption from the Sherman Act afforded by the definition of a labor dispute in the Norris-LaGuardia Act. United States v. Carrozzo, 37 F.Supp. 191

(N.D.Ill.), aff'd, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508 (1941) (per curiam); United States v. AFM, supra.

## IX. REQUIRING ORCHESTRA LEADERS TO USE THE FORM B CONTRACT

The language of the Form B Contract describes the orchestra leader as an employee and the purchaser of the music as an employer. Its function is apparently to help establish this relationship in law. It also serves as a means of policing adherence to union scale, since the union requires that such contracts or, in the club date field, a report, be filed. The contract shows the price and terms of the engagement.

■■■ It is not clear how the use of the Form B Contract can result in a restraint of trade. In practice, the contract has failed miserably in fulfilling its primary purpose—making employees out of orchestra leaders.

The status of orchestra leaders in the club date single engagement field has been ruled on by courts on several occasions. In each instance the courts looked to all the factors which made up the employment relationship and concluded that the orchestra leaders involved there (Cutler, Carroll, Peterson) were employers. E. g., Cutler v. AFM, supra; Carroll v. Associated Musicians of Greater New York, supra; Cutler v. United States, supra. The Form B Contract was signally unpersuasive, "a self-serving subterfuge which is not entitled to any weight," according to Judge Lumbard, Cutler v. AFM, 316 F.2d at 548–549. I can see no restraint of trade in the terminology in the Form B Contract referring to orchestra leaders as employees.

■■■ Nor does the requirement that the contracts be filed with the union violate the antitrust laws. The union has a legitimate interest in knowing the terms under which its members work and does not restrain trade in gathering this information.

## X. REGULATING BOOKING AGENTS AND CATERERS

### A. Booking Agents

The Federation instituted the licensing of booking agents and the fixing of maximum commissions at a time when the activities of booking agents were instrumental in depressing wages paid to union musicians below the union scale. Apparently, similar abuses by booking agents existed in other fields too. Edelstein v. Gillmore, 35 F.2d 723, 726 (2d Cir. 1929) (actors). The objective of the Federation was the elimination of the practices which undermined the musicians' wage structure and the regulations adopted were successful.

Booking agents are independent contractors not in job or direct wage competition with members of the defendant unions. Apparently, no court has had to decide the question of whether a group of independent contractors performing different functions than a union's members and not in competition with union members for jobs may be subjected to union regulations consistent with the antitrust laws.

■■■ In affirming the decision of the district court in Los Angeles Meat and Provision Drivers Union, etc. v. United States, supra, the Supreme Court was careful to note and repeat, id., 371 U.S. at 103, 83 S.Ct. 162, 9 L.Ed.2d 150, the absence of "any actual or potential wage or job competition, *or of any other economic interrelationship*, between the grease peddlers [independent contractors] and the other members of the union." Id. at 98, 83 S.Ct. at 164. On this basis it is safe to assert that economic interrelationships other than actual or potential job or wage competition will suffice to support a finding that a group of independent contractors are a labor group. Id. at 104, 83 S.Ct. 162 (Goldberg, J., concurring).

The scope of the exemption accorded to labor from the antitrust laws is determined by the definition of "labor dispute" in Section 13 of the Norris-La-

Guardia Act, 29 U.S.C. § 113. United States v. Hutcheson, supra. Section 13 (c) provides that such a dispute "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." A person is "participating or interested in a labor dispute" under Section 13(b) if he "is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation."

This definition of a labor dispute is the source of the test of actual competition or other economic interrelationship between independent contractors and union members for determining whether the former is a labor group that the union may regulate. Los Angeles Meat Drivers etc. v. United States, supra; Milk Wagon Drivers Union etc. v. Lake Valley Farm Prods., Inc., supra. Although job and wage competition may be the most common indicia of a labor dispute involving independent contractors, there is no reason why such competition should be the only criterion satisfying the Norris-LaGuardia definition.

▆▆▆ Because the activities of the booking agents here have and had a direct and substantial effect on the wages of the members of defendants, I find that they are in an economic interrelationship with the members of defendants such that the defendants are justified in regulating their activities without contravening the Sherman Act. Furthermore, I find the regulations to be reasonably related to their interest in maintaining observance of union scale wages and working conditions.

### B. Caterers

Caterers, also independent contractors not in job or wage competition with union members, are in a unique position to affect the choice of orchestras by purchasers of music and the wages and working conditions of musicians. They have frequent contact with purchasers of music, control places where musicians perform and are relied on to arrange many aspects of the functions at which musicians perform.

The evidence discloses that caterers took advantage of their position before the union adopted its regulations to, in effect, book orchestras and they continue to do so, at least to some extent. Caterers recommend orchestras to customers and receive commissions from orchestra leaders. These practices actually or potentially affect the wages of the musicians involved.

▆▆▆ I believe that this constitutes an economic interrelationship which permits the defendants to regulate and prohibit the booking activities of the caterers without violating the Sherman Act.

### XI. RESTRICTIONS ON TRAVELING ORCHESTRAS

Various AFM regulations favor the employment of local musicians rather than musicians from outside the jurisdiction. The principal incentive to employ local musicians is a requirement that "foreign" musicians be paid higher wages.

▆▆▆ Local employment and working conditions have long been recognized as legitimate concerns of labor unions. See American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360 (1921). In the face of antitrust attack, courts have repeatedly sustained union regulations requiring a foreign employer to adhere to the shorter workday and the higher wage scale of the standards prevailing in his home local or the local where the work was to be performed and to hire a specified percentage of his men from the latter local. Rambusch Decorating Co. v. Brotherhood of Painters, etc., 105 F.2d 134 (2d Cir. 1939), cert. denied, 308 U.S. 587, 60 S.Ct. 110, 84 L.Ed. 492 (1939); Barker Painting Co. v. Brotherhood of Painters, etc., 57

App.D.C. 322, 23 F.2d 743 (1927), cert. denied, 276 U.S. 631, 48 S.Ct. 324, 72 L.Ed. 741 (1928); Barker Painting Co. v. Brotherhood of Painters etc., 15 F.2d 16 (3d Cir. 1926), cert. denied, 273 U.S. 748, 47 S.Ct. 449, 71 L.Ed. 871 (1927).

The Second Circuit noted in Rambusch, supra, 105 F.2d at 138:

"* * * Of course, the real point here relied on is the supposed discrimination between non-resident and resident contractors. Discrimination of this general kind is one of the most natural things in the world, applied by states and cities in civil service appointments; by courts in cost bonds and other burdens against non-residents; by merchants, customers, laborers, and servants in trusting and favoring the local man with whom they have long dealt and expect to deal in the future. * * *"

I find no antitrust violation in the regulations here protecting local employment opportunities.

## XII. MONOPOLIZATION

Plaintiffs' claim that the defendant unions are attempting to or have monopolized the music industry boil down to the fact that the defendants are enforcing a closed shop. It is clear that this violates no antitrust law. United States v. AFM, supra; Courant v. International Photographers of Motion Picture Industry etc., 176 F.2d 1000 (9th Cir. 1949), cert. denied, 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950); Kolb v. Pacific Maritime Ass'n, 141 F.Supp. 264 (N.D.Cal.1956).

In conclusion I find that defendants have violated no antitrust law. The complaints also allege the existence of a common-law restraint of trade. I find this charge to be equally without substance.

Although the defendants have successfully defended this suit, they are not entitled to attorneys' fees. 15 U.S.C. § 15; Talon, Inc. v. Union Slide Fastener, Inc., 266 F.2d 731, 739–740 (9 Cir. 1959); Alden-Rochelle, Inc. v. ASCAP, 80 F.Supp. 888, 899–900 (S.D.N.Y.1948).

## CONCLUSIONS OF LAW

1. The defendant unions are labor organizations within the meaning of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–113; the National Labor Relations Act, 29 U.S.C. § 151 et seq.; and the Clayton Antitrust Act, § 6, 15 U.S.C. § 17.

2. Defendants' motion to strike certain evidence, on which decision was reserved, is denied.

3. Plaintiffs Turecamo and Terry are no longer parties to this action.

4. Plaintiff Orchestra Leaders of Greater New York is not a proper party plaintiff and lacks standing to sue in this action.

5. The plaintiffs have failed to establish their claim to represent other orchestra leaders. Only the parties to the action will be affected by the decree.

6. There is job and wage competition and other economic interrelationship, significantly affecting defendants' legitimate union interests between plaintiffs in the club date single and hotel steady engagement fields and other employee-members of defendant unions who perform services as subleaders and sidemen in the club date and hotel steady engagement fields.

7. The plaintiffs are employees of the recording companies and television broadcasters when they perform services for them.

8. The plaintiffs constitute a "labor" group.

9. The defendant unions may legally pressure the plaintiffs into becoming members.

10. None of the defendants' regulations and practices complained of by plaintiffs constitute a violation of the federal antitrust laws (15 U.S.C. § 1 et seq.) or a common-law restraint of trade. They all come within the definition of the term "labor dispute" in the Norris-LaGuardia Act, 29 U.S.C. § 113, and are exempt from the antitrust laws.

11. The complaints in these actions should be dismissed and judgments entered for defendants, with costs to defendants.